AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☑ Original      ☐ Dup

**CLERK'S OFFICE**
A TRUE COPY
Feb 12, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
## for the
Eastern District of Wisconsin ▼

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>11 Cellular Telephones (Target Devices), which are<br>currently stored at the FBI Milwaukee Field Office, in<br>St. Francis, Wisconsin. | )<br>)<br>)<br>)  Case No.     26-MJ-28<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____02/26/2026_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable William E. Duffin_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     02/12/2026 at 3:00 p.m.                    *William E. Duffin*
                                                                     *Judge's signature*

City and state:        Milwaukee, WI              Honorable William E. Duffin, U.S. Magistrate Judge
                                                            *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name(s) of any person(s) seized: |
|---|

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

The property to be searched, collectively the TARGET DEVICES, is described as follows:

**Target Device 1**

An Apple iPhone, unknown model, unknown serial number, with a blue backing and single camera lens, believed to be owned by Christian GARRETT and seized from inside 3722 W Karstens Dr #2, Madison, WI on January 27, 2026. **TARGET DEVICE 1** is labeled as evidence item 1B24 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

**Target Device 2**

An Apple iPhone, unknown model, unknown serial number, with a black backing three camera lenses, and a black protective case, believed to be owned by Sharad WILLIAMS and seized from his person on January 27, 2026. **TARGET DEVICE 2** is labeled as evidence item 1B14 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

**Target Device 3**

An Apple iPhone, unknown model, unknown serial number, with a black backing and two camera lenses, believed to be owned by Sharad WILLIAMS and seized from 3722 W Karstens Dr #1, Madison, WI on January 27, 2026. **TARGET DEVICE 3** is labeled as evidence item 1B8 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

112

## Target Device 4

A Samsung phone, unknown model, IMEI number 351867553456127 printed on the back, with a dark blue backing and three camera lenses, believed to be owned by Jerden MONTGOMERY and seized from his person on January 27, 2026. **TARGET DEVICE 4** is labeled as evidence item 1B20 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

## Target Device 5

A Foxx Android phone, unknown model, unknown serial number, with a black backing and three camera lenses, believed to be owned by Jerden MONTGOMERY and seized from his person on January 27, 2026. **TARGET DEVICE 5** is labeled as evidence item 1B19 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

## Target Device 6

A Foxx Android phone, unknown model, unknown serial number, with a black backing and two camera lenses, believed to be owned by Mark YOUNG and seized from his person on January 27, 2026. **TARGET DEVICE 6** is labeled as evidence item 1B15 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

## Target Device 7

An Apple iPhone, unknown model, unknown serial number, with a cracked and broken blue backing and two camera lenses, with an unknown owner and seized from inside 3722 W Karstens Dr #1, Madison, WI on January 27, 2026. **TARGET DEVICE 7** is labeled as evidence

item 1B7 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

## Target Device 8

An Apple iPhone, unknown model, unknown serial number, with a black backing, a single camera lens, and a green protective case with a bear logo, believed to be owned by Kristina SULLIVAN and seized from inside 3722 W Karstens Dr #2, Madison, WI on January 27, 2026. **TARGET DEVICE 8** is labeled as evidence item 1B26 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

## Target Device 9

A Summit 5G phone, unknown model, unknown serial number, with a blue backing and four camera lenses, believed to be owned by Ace DAVIS and seized from inside 756 Odana Ln, Madison, WI on January 27, 2026. **TARGET DEVICE 9** is labeled as evidence item 1B17 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

## Target Device 10

An Apple iPhone, unknown model, unknown serial number, further described in Attachment A, believed to be owned by Cierra MCGARY and seized from her person during an arrest in Madison, WI on January 24, 2026. **TARGET DEVICE 10** is labeled as evidence item 1B45 and is in the custody of the FBI and is physically located at the FBI Milwaukee Field Office.

114

**Target Device 11**

An Apple iPhone, unknown model, unknown serial number, with a blue backing, three camera lenses, and a blue protective cas, believed to be owned by Christian GARRETT and seized from inside 3722 W Karstens Dr #3, Madison, WI on January 27, 2026. **TARGET DEVICE 11** is labeled as evidence item 1B42 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

This warrant authorizes the forensic examination of the devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the **TARGET DEVICES** described in Attachment A, along with any memory card or other data storage device within or connected to that device, from January 1, 2025, to present, that relate to violations of distribution, possession, and possession with intent to distribute controlled substances, in violation of Title 21 U.S.C. § 841; conspiracy to distribute, possess, and possession with intent to distribute controlled substances, in violation of Title 21 U.S.C. § 846; money laundering in violation of Title 18 U.S.C. § 1956; and sex trafficking by force, fraud, or coercion, in violation of Title 18 U.S.C. § 1591(a)(1), including:

    a. All outgoing and incoming calls, electronic mail, text messages, and instant messages, including chats or messages from social media platforms;

    b. Lists of suppliers and customers, drug records or ledgers, and related identifying information;

    c. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    d. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    e. All bank records, checks, credit cards bills, account information, and other financial records;

    f. Evidence indicating the geographic location of the cell phone at times relevant to the investigation;

    g. Records of Internet Protocol addresses used;

116

h. Evidence indicating the cell phone user's state of mind as it relates to the crime under investigation; and

i. Pictures or videos of drugs or drug associates.

j. Any information, to include photographs, videos, messages, call records, financial transactions, social media posts, notes, documents, price lists, menus, online advertisement, and emails relating to commercial sex.

2. Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history.

3. Records and information stored within the **TARGET DEVICES**, along with any memory card or other data storage device within or connected to that cellular telephone, which is in secure storage at the FBI Milwuakee Office Evidence Control Center storage in St. Francis, Wisconsin , such as:

a. Drug records, address books, calendars and scheduling data, drug notes, drug ledgers, seller lists, buyer lists;

b. Data indicating outgoing and incoming calls to drug sellers and buyers together with emails, chat, text, or instant messages;

c. Sex trafficking records, address books, calendars and scheduling data, commercial sex notes, ledgers, customer lists.

d. Data indicating outgoing and incoming calls to commercial sex customers with emails, chat, text, or instant messages;

117

e. Evidence indicating how and when the cell phone account was accessed or used, to determine the chronological context of account access, use, and events relating to the crime under investigation and to the cell phone account owner;

f. Evidence indicating the geographic location of the cell phone at times relevant to the investigation; and,

g. Evidence indicating the cell phone account owner's state of mind as it relates to the crime under investigation.

4. As used above, the terms "records" and information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.



CLERK'S OFFICE
A TRUE COPY
Feb 12, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>11 Cellular Telephones (Target Devices), which are currently stored at the FBI Milwaukee Field Office, in St. Francis, Wisconsin. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No.  26-MJ-28 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841; | Distribution and Possession with Intent to Distribute Controlled Substances; |
| 21 U.S.C. § 846; | Conspiracy; |
| 18 U.S.C. § 1956; | Money Laundering; |
| 18 U.S.C. § 1591(a)(1) | Sex Trafficking by Force, Fraud,or Coercion |

The application is based on these facts:
See the attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Dylan Thurmer, Special Agent FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: 02/12/2026

*Judge's signature*

City and state: Milwaukee, WI                Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Dylan J. Thurmer, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Federal Rule of Criminal Procedure 41 for a search warrant authorizing the examination of property— the electronic devices described in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation and have been since January 20, 2020. I am assigned to the Madison Resident Agency within the Milwaukee Field Office. During my time as a Special Agent, I have participated in investigations involving violent crime, neighborhood-based gangs, drug trafficking, and organized crime. In addition, I have worked with other FBI agents and law enforcement officers of varying experience levels, who have also investigated violent crime, sex trafficking, drug trafficking networks, and organized crime, including criminal activity engaged in by gangs and criminal enterprises.

3. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to execute search warrants for, offenses enumerated in Title 18 of the United States Code. I am also a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

4. I have participated in the execution of search warrants in various judicial districts, including the recovery of financial records, computers, cellular phones, and other digital storage devices and have participated in dozens of investigations involving the subsequent analysis of date from these devices.

5. I make this affidavit from information provided by other agencies including arrest reports, search warrants, and review of reports by myself and/or other law enforcement agents, communication with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is being submitted for the limited purpose of seeking search warrants, I have not included each and every fact known to me concerning this investigation.

6. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence may be found on the targeted cellular telephones for violations of distribution, possession, and possession with intent to distribute controlled substances, in violation of Title 21 U.S.C. § 841; conspiracy to distribute, possess, and possession with intent to distribute controlled substances, in violation of Title 21 U.S.C. § 846; money laundering in violation of Title 21 U.S.C. § 1956; and sex trafficking by force, fraud, or coercion, in violation of Title 18 U.S.C. § 1591(a)(1) (herein after the "TARGET OFFENSES") . There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7. The property, collectively the **TARGET DEVICES**, to be searched is as follows:

2

a. **Target Device 1:** An Apple iPhone, unknown model, unknown serial number, with a blue backing and single camera lens, further described in Attachment A, believed to be owned by Christian GARRETT and seized from inside 3722 W Karstens Dr #2, Madison, WI on January 27, 2026.

b. **Target Device 2:** An Apple iPhone, unknown model, unknown serial number, with a black backing three camera lenses, and a black protective case, further described in Attachment A, believed to be owned by Sharad WILLIAMS and seized from his person on January 27, 2026.

c. **Target Device 3:** An Apple iPhone, unknown model, unknown serial number, with a black backing and two camera lenses, further described in Attachment A, believed to be owned by Sharad WILLIAMS and seized from 3722 W Karstens Dr #1, Madison, WI on January 27, 2026.

d. **Target Device 4:** A Samsung phone, unknown model, IMEI number 351867553456127 printed on the back, with a dark blue backing and three camera lenses, further described in Attachment A, believed to be owned by Jerden MONTGOMERY and seized from his person on January 27, 2026.

e. **Target Device 5:** A Foxx Android phone, unknown model, unknown serial number, with a black backing and three camera lenses, further described in Attachment A, believed to be owned by Jerden MONTGOMERY and seized from his person on January 27, 2026.

f. **Target Device 6:** A Foxx Android phone, unknown model, unknown serial number, with a black backing and two camera lenses, further described in

Attachment A, believed to be owned by Mark YOUNG and seized from his person on January 27, 2026.

g.  **Target Device 7:** An Apple iPhone, unknown model, unknown serial number, with a cracked and broken blue backing and two camera lenses, further described in Attachment A, with an unknown owner and seized from inside 3722 W Karstens Dr #1, Madison, WI on January 27, 2026.

h.  **Target Device 8:** An Apple iPhone, unknown model, unknown serial number, with a black backing, a single camera lens, and a green protective case with a bear logo, further described in Attachment A, believed to be owned by Kristina SULLIVAN and seized from inside 3722 W Karstens Dr #2, Madison, WI on January 27, 2026.

i.  **Target Device 9:** A Summit 5G phone, unknown model, unknown serial number, with a blue backing and four camera lenses, further described in Attachment A, believed to be owned by Ace DAVIS and seized from inside 756 Odana Ln, Madison, WI on January 27, 2026.

j.  **Target Device 10:** An Apple iPhone, unknown model, unknown serial number, further described in Attachment A, believed to be owned by Cierra MCGARY and seized from her person during an arrest in Madison, WI on January 24, 2026.

k.  **Target Device 11:** An Apple iPhone, unknown model, unknown serial number, with a blue backing, three camera lens, and a blue protective case further described in Attachment A, believed to be owned by Christian GARRETT and seized from inside 3722 W Karstens Dr #3, Madison, WI on January 27, 2026.

4

8. All TARGET DEVICES are currently in the FBI-Milwaukee Office located in the Eastern District of Wisconsin for data extraction.

9. This warrant seeks authorization for the forensic examination of the TARGET DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### *Background information and Summary of the Investigation*

10. Members of the Dane County Narcotics Task Force (DCNTF), the FBI, and the DEA, collectively referred to as the "Investigative Team," have been actively investigating Christian GARRETT a/k/a "Tone" or "Tony" and the Christian GARRETT Criminal Enterprise (CGCE) since March of 2025. The CGCE is believed to be a criminal enterprise run by GARRETT operating primarily in the City of Madison, WI and its surrounding communities. GARRETT and his brother CORNELIUS Garrett a/k/a "DC" (herein after "CORNELIUS") have been identified through Confidential Human Source/s ("CHS") and cooperating sources of information (SOI/s) as Mickey Cobra gang members, a Chicago based gang with roots that extend to the 1950s.

11. As described in the proceeding paragraphs, the CGCE is comprised of co-conspirators and their associates who primarily earn money through the distribution of controlled substances such as crack cocaine, methamphetamine, and heroin. The CGCE obtains their narcotic supply from Chicago, IL based sources.

5

12. GARRETT operates the CGCE out of hotels, Porchlight, Inc[1] properties, privately owned multi-unit apartment complexes and townhomes. Recently investigators identified four apartments, Apartment #1, Apartment #2, Apartment #3, and Apartment #4, (collectively referred to as the KARSTEN RESIDENCES) within 3722 W Karstens Dr, Madison, WI and a townhome located at 756 Odana Ln, Madison, WI (756 Odana Ln) as being controlled by GARRETT and used by GARRETT and the CGCE as central hubs for the use, storage, and distribution of controlled substances.

13. In addition to drug trafficking, the CGCE has historically used properties under their control for the purpose of facilitating prostitution and sex trafficking by force, fraud, and coercion. This includes the KARSTENS RESIDENCES and, in the past, 710 Odana Lane in Madison WI. As explained below, investigators believe that CGCE recently lost control of 710 Odana Lane and moved operations from that address to 756 Odana Lane.

14. Beginning in March 2025, members of the Investigation Team have utilized investigative techniques to better understand GARRETT's operation and his associates. These techniques have included controlled narcotic and gun purchase operations utilizing CHS/s and sworn law enforcement undercover employees (UCE/s), applied for and executed State and Federal pen and ping warrants for GARRETT's telephone numbers, applied for and executed GPS warrants for vehicles associated with the CGCE, reviewed police reports documenting arrests of individuals associated with this investigation, conducted physical and electronic surveillance operations, applied for and executed three TIII orders authorizing the interceptions of wire communications over telephone numbers attributed

---

[1] Porchlight, Inc is a program in Dane County, WI which publicly advertises resources aimed at reducing homelessness by providing transitional housing for those in need. Investigators know 310 N Hamilton and 5818 Russett Rd are Porchlight properties.

to GARRETT, conducted refuse searches, and interviewed and debriefed CHS/s and SOI/s who had knowledge of GARRETT's operation. These investigative techniques, which will be explained in more detail below, were successful in broadening the Investigative Team's collective knowledge on GARRETT's criminal activity as well as identifying further associates, assets, and addresses under GARRETT's control.

### *CHS Debriefings*

15. The Investigative Team has developed CHSs who have provided background information regarding GARRETT and the CGCE as well as more detailed information about the criminal activity being committed by GARRETT and the CGCE that is of investigative interest.

### CHS-1

16. CHS-1[2] was originally identified and utilized by the DCNTF as a local confidential informant (CI). CHS-1 was eventually introduced to the FBI and DEA and signed up by the FBI as a CHS. CHS-1 is an individual who associated themselves with GARRETT primarily as a narcotics customer. CHS-1 reported being a customer of GARRETT's since late 2024. CHS-1 assisted the Investigative Team in making seven controlled purchases into the CGCE. CHS-1 has been interviewed on multiple occasions and has provided credible and valuable information on GARRETT's criminal activity.

---

[2] CHS-1 has a criminal history include arrests for Disorderly Conduct, Possession of Narcotic Drugs, and Possession of Drug Paraphernalia. CHS-1 was not convicted on any of these arrests. CHS-1 is motivated to cooperate for monetary reward. Your complainant believes CHS-1 to be truthful and reliable because a significant amount of information from CHS-1 has provided to law enforcement has been corroborated by other witnesses, law enforcement surveillance, and physical evidence including audio/video recordings obtained by investigators on multiple occasions during CHS-1's controlled purchases as further detailed below. Additionally, CHS-1 has made statements against their penal interest.

7

17. CHS-1 reported that GARRETT is a Mickey Cobra gang member from Chicago, IL. CHS-1 reported that GARRETT was smart, non-flashy, and good with money. CHS-1 reported consistently buying crack cocaine from GARRETT since being introduced to him. CHS-1 more specifically reported buying crack cocaine on a daily basis from GARRETT for approximately six months, January 2025 through June 2025. CHS-1 reported buying approximately a "ball" of crack cocaine at a time, CHS-1 defined a "ball" as 3.5 grams of a narcotic. CHS-1 reported paying approximately $125 per 3.5 grams of crack cocaine. CHS-1 reported that GARRETT originally used a local "cook," named Josie Dorn, to manufacture the crack cocaine. Since then, GARRETT and Dorn's relationship fractured, and GARRETT learned to manufacture crack cocaine himself.

18. CHS-1 reported GARRETT utilized Cash App accounts to receive payment for narcotic transactions. CHS-1 reported on multiple accounts associated with GARRETT. CHS-1 reported a Cash App account named Nino 448. CHS-1 showed investigators the account information via their own Cash App account. Investigators noted that the username was Nino448 but the cash tag, or account identifier, was $Tony16z.  CHS-1 later provided another Cash App account for GARRETT with a cash tag of $nino16z and a username of Love.

19. Throughout the investigation CHS-1 reported during separate debriefings that GARRETT controlled multiple properties in and around the Madison, WI area. These reported properties included 310 N Hamilton St, multiple apartment units inside of 333 W Dayton St, 710 Odana Lane, 7555 Widgeon Way, an apartment inside of 6810 Milwaukee Street, 5818 Russett Rd, the KARSTEN RESIDENCES, and an apartment, identified as #324,

8

inside of 818 W Main St. CHS-1 identified some of the addresses as being run by sub-distributors who work for GARRETT.

20. CHS-1 identified Tevin NEWELL via a historical jail booking photograph. CHS-1 reported NEWELL as running 310 N Hamilton for GARRETT and identified NEWELL as GARRETT's partner.

21. CHS-1 identified Jerden MONTGOMERY via a historical jail booking photograph. CHS-1 reported MONTGOMERY as operating within 710 Odana Ln. CHS-1 reported 710 Odana Ln. was a narcotics distribution spot and a sex-trafficking location. CHS-1 reported GARRETT was providing women working out of 710 Odana Ln with crack cocaine and heroin in exchange for fifty percent of their sex-trafficking revenue.

22. CHS-1 identified Jeremy ELISIUS via a historical jail booking photograph. CHS-1 described ELISIUS as GARRETT's loyal associate and "muscle." CHS-1 reported ELISIUS was tasked by GARRETT to collect drug debts from customers. CHS-1 reported seeing ELISIUS at multiple properties under the control of GARRETT, to include 310 N Hamilton, 710 Odana, and 7555 Widgeon Way.

23. CHS-1 identified David GUDEX-CROSS via a historical jail booking photograph. CHS-1 reported 7555 Widgeon Way was a narcotics distribution spot for GARRETT that was run by GUDEX-CROSS. CHS-1 had observed ELISIUS frequently at the address in addition to GARRETT.

24. CHS-1 reported GARRETT had a brother named CORNELIUS Garrett a/k/a "DC." CHS-1 reported meeting CORNELIUS briefly in 2024 around the same time they met GARRETT. CHS-1 reported CORNELIUS was a member of the Micky Cobra gang and a narcotics distributor.

9

25. CHS-1 reported GARRETT had access to firearms. CHS-1 reported being with GARRETT at 818 W Main St while GARRETT possessed a Glock handgun. In early October 2025, CHS-1 reported being with GARRETT at 3722 W Karstens Dr, Apartment #4 while GARRETT was in possession of a firearm that looked like a short AK-47, sometimes referred to as a "Draco." CHS-1 described the Draco as being black and brown in color with a magazine inside of it.

26. On January 1, 2026, CHS-1 reported to investigators that GARRETT began using a new cellular telephone number, (310) 290-2233. CHS-1 had historically provided accurate reporting on GARRETT's number changes. CHS-1 identified the number as GARRETT's new drug number, specifically used by drug customers to contact GARRETT. (310) 290-2233 was identified by investigators to be a T-Mobile number. An administrative subpoena was sent to T-Mobile on January 2, 2026. The subpoena response, returned the same day, showed no subscriber information and that the phone was activated on December 11, 2026. Toll analysis of (310) 290-2233 showed consistent contacts, 26 common callers, between it and GARRETT's previous drug phone, (608) 381-8495.

CHS-3

27. CHS-3[3] was recruited by the Investigative Team and subsequently signed up as an FBI CHS. CHS-3 is an individual who associated themselves with GARRETT primarily as a

---

[3] CHS-3 has a criminal history that includes an arrest for Hit and Run. CHS-3 was motivated to cooperate for monetary reward. CHS-3 did have one recorded instance of being untruthful to the Investigative Team. In October, 2025, CHS-3 self-reported obtaining crack cocaine from CORNELIUS Garrett and Alfred OLIVER to the Investigative Team. CHS-3 reported receiving 3.5 grams of crack cocaine which was subsequently turned over to the Investigative Team. CHS-3 was questioned and found to have actually received 7 grams of crack cocaine. CHS-3 admitted to re-distributing 3.5 grams for monetary gain without initial informing the Investigative Team. CHS-3 was remorseful for their actions, appeared honest about what had occurred, and provided additional details on the incident. CHS-3 stated they were in financial hardship and sold the crack cocaine due to wanting money to pay for groceries. Even though CHS-3 was found to have been untruthful in the above incident your complainant believes it

10

narcotics customer. CHS-3 reported being a customer of GARRETT's since mid-2024. CHS-3 has been interviewed on multiple occasions and has provided credible and valuable information on GARRETT's criminal activity. CHS-3 has participated in controlled purchases for the Investigative Team leading to the seizure of drug evidence against CGCE associates. CHS-3 further assisted the Investigative Team by consenting to consensual monitoring of their telephone communications via one party consent. The Investigative Team successfully monitored and recorded communications between CHS-3 and GARRETT.

28. CHS-3 reported meeting GARRETT through a mutual friend, Jeremy ELISIUS, in 2024. CHS-3 reported being introduced to GARRETT for the sole purpose of buying crack cocaine. While CHS-3 maintained a relationship with GARRETT, late 2024 through late 2025, they reported consistently purchasing crack cocaine from him, generally around 3.5 grams at a time.

29. CHS-3 reported GARRETT utilized a Toyota Sienna minivan with a temporary WI registration, later identified by the Investigative Team during surveillance as Y4326W. A check of the temporary registration revealed that it returned to CHS-3. CHS-3 reported the registration was obtained without CHS-3's consent. CHS-3 reported they did not pay for the van, nor were they present when it was purchased.

---

was an isolated incident. Your complainant believes CHS-3 has been truthful and reliable throughout the investigation because a significant amount of information from CHS-3 has provided to law enforcement has been corroborated by other witnesses, law enforcement surveillance, and physical evidence including audio/video recordings obtained by investigators on multiple occasions during CHS-3's recorded audio telephone calls as further detailed below. Additionally, CHS-3 has made statements against their penal interest. CHS-3 was discontinued as a CHS with the FBI on 10/17/25 due to a disinterest in continuing to maintain relationships with members and associates of the CGCE. CHS and the Investigative Team maintain communication but no taskings have been assigned since.

30. CHS-3 reported GARRETT had a Cash App account named Nino448. Investigators reviewed CHS-3's cash app account and confirmed that the username was Nino448 but the cash tag, or account identifier, was $tony16z.

31. CHS-3 reported that GARRETT controlled multiple properties in and around the Madison, WI area, to include 310 N Hamilton St. CHS-3 identified 310 N Hamilton St as a "trap house" controlled by GARRETT. Based on my training and experience and knowledge of this case I know a trap house can refer to a residence primarily used for the distribution of narcotics.

32. CHS-3 identified Tevin NEWELL via a historical jail booking photograph. CHS-3 reported NEWELL is running 310 N Hamilton St for GARRETT.

33. CHS-3 identified Jerden MONTGOMERY via a historical jail booking photograph. CHS-3 reported MONTGOMERY is an associate of GARRETT's.

34. CHS-3 identified Jeremy ELISIUS via a historical jail booking photograph. CHS-3 reported ELISIUS is an associate of GARRETT's and the person who introduced GARRETT to CHS-3.

35. CHS-3 identified "JB" via a surveillance photograph captured by the Investigative Team. The Investigative Team knows the alias "JB" be used by a GARRETT associate, Sharad WILLIAMS. CHS-3 reported WILLIAMS was an associate of NEWELL and GARRETT and stayed at 310 N Hamilton St. CHS-3 provided two cellular telephone numbers for WILLIAMS, 608-590-2269, believed to be **Target Device 2** and 773-974-6979.

36. CHS-3 identified David GUDEX-CROSS via a surveillance photograph obtained by the Investigative Team. CHS-3 identified GUDEX-CROSS as an associate of GARRETT's and living at 7555 Widgeon Way.

12

37. CHS-3 identified Antanisha BRANCH via a historical jail booking photograph and identified BRANCH as GARRETT's girlfriend.

38. CHS-3 reported GARRETT as having a brother named CORNELIUS Garrett a/k/a "DC." CHS-3 reported meeting CORNELIUS in August or September 2024. CHS-3 reported buying crack cocaine from CORNELIUS in the past. CHS-3 reported that GARRETT and CORNELIUS have associates in common in the Madison area. CHS-3 reported CORNELIUS introduced two sub-distributors, Dawayne TILLMAN and Rahmaan REED, to CHS-3 in early 2025. CHS-3 reported that during that time period TILLMAN and REED both distributed narcotics out of CHS-3's apartment for CORNELIUS.

39. CHS-3 reported trafficking large amounts of narcotics from Chicago to Madison for CORNELIUS in 2025. CHS-3 described two separate occasions where they traveled to Chicago for the purpose of transporting drugs back to the Madison area and delivering them to residences under the control of the CGCE. Below is a summary of those trips:

   a. During the first reported trip, CORNELIUS paid for a bus ticket that CHS-3 used to travel from Madison to a Chicago based airport. CHS-3 was picked up by CORNELIUS at the airport and transported to a gas station where CORNELIUS gave CHS-3 an insulated shopping bag with narcotics inside. CHS-3 took a bus from the airport back to Madison with the bag. Once back in Madison, CHS-3 was directed by CORNELIUS via a telephone conversation to sell a "ball," known to be 3.5 grams, to one of his customers and then transport the remaining narcotics to 7555 Widgeon Way, GUDEX-CROSS's house.

   b. During the second reported trip, CHS-3 was instructed to use a U-Haul van, rented under GUDEX-CROSS's name. CHS-3 was instructed by WILLIAMS to

drive the van to 250 W. 119th St. in Chicago. CORNELIUS met CHS-3 at the location and put a bag of narcotics into the back of the van and provided CHS-3 with a small quantity of crack cocaine as payment. Upon returning to the Madison area, CHS-3 called CORNELIUS and was instructed to drive to 310 N Hamilton St where WILLIAMS subsequently took some of the narcotics. WILLIAMS instructed CHS-3 to drive to 7555 Widgeon Way. CHS-3 took the remaining narcotics from the van inside the residence and gave the narcotics to GUDEX-CROSS. GUDEX-CROSS paid CHS-3 with a "ball" of crack cocaine for delivering the narcotics. GUDEX-CROSS instructed CHS-3 to return to 310 N Hamilton St where WILLIAMS met CHS-3 and took possession of the van.

40. CHS-3 reported Alfred OLIVER was an associate of CORNEILIUS and GARRETT. CHS-3 reported OLIVER was extremely loyal to CORNELIUS and has historically transported narcotics from Chicago to Madison in a similar manner as described above. CHS-3 reported OLIVER has a storage unit located at 4302 Commercial Ave, Madison, WI where narcotics are stored.

41. In September 2025, CHS-3 reported visiting the storage unit, identified as #446, with OLIVER and observing approximately half an ounce of crack cocaine being stored inside. CHS-3 reported questioning OLIVER about the narcotics and OLIVER told CHS-3 that the narcotics were "DC's" and that OLIVER did not "mess" with them.

42. CHS-3 reported allowing GARRETT to stay at their apartment for approximately a month around July and August 2025. During that timeframe, GARRETT manufactured crack cocaine and sold crack cocaine, heroin, and methamphetamine from the apartment to his customers.

14

43. CHS-3 reported that on August 22, 2025, GARRETT left CHS-3's residence and left behind a black duffle bag in a closet. CHS-3 opened the duffle bag and observed approximately five to seven thousand dollars, a quart sized bag filled with methamphetamine, heroin, marijuana, as well as a "brick", which based on my training and experience as well as my specific knowledge of this case means a kilogram of cocaine. CHS-3 reported weighing the heroin on a small scale and observing it weighed approximately 46 grams.

44. CHS-3 reported the "brick" of cocaine was wrapped in black wrapping with clear wrapping over the top. CHS-3 reported the cocaine packaging was marked with an "X" and the word "base."

45. During the timeframe that CHS-3 was signed up as an FBI source, which ended on October 17, 2025, they reported telephone number (310) 770-7675 as the number they knew GARRETT to be using.

CHS-4

46. CHS-4[4] was initially interviewed at the Dane County Jail by SA Callon Andrews and Det. Corey Nelson. CHS-4 agreed to answer questions post-Miranda. After the interview CHS-4 was recruited by the Investigative Team and subsequently signed up as a DCNTF CHS.

47. CHS-4 is an individual who associated themselves with GARRETT primarily as a narcotics sub-distributor. CHS-4 reported they sold drugs for profit and estimated they

---

[4] CHS-4 has a criminal history including convictions for Possession of Drug Paraphernalia, Possession with Intent – Amphetamine (>10-50g), DUI – Alcohol, Domestic Battery – Bodily Harm, and Manufacture/Delivery of Controlled Substances. CHS-4 is motivated to cooperate for judicial consideration for pending charges. Your complainant believes CHS-4 to be truthful and reliable because a significant amount of information from CHS-4 has provided to law enforcement has been corroborated by other witnesses, law enforcement surveillance, physical evidence, and Title III interceptions. Additionally, CHS-4 has made statements against their penal interest.

had sold 1 to 2 pounds per week, approximately 1 pound of crystal methamphetamine and 1 pound of cocaine/cocaine base per week. CHS-4 reported they did not sell heroin. CHS-4 reported the narcotics he sold came from GARRETT. CHS-4 reported GARRETT charged them $60 per 3.5 grams of cocaine and $150 per ounce of crystal methamphetamine.

48. CHS-4 estimated they had been selling drugs at those amounts for approximately six months to a year, most of 2025. CHS-4 reported they would go to the "trap," 3722 W Karstens Dr Apt #1 for cocaine and crystal methamphetamine on a routine basis. CHS-4 stated they would get cocaine or crystal methamphetamine from whomever was working inside the apartment. CHS-4 stated they would then bring back money to apartment #1 and give it whomever was working at the time.

49. CHS-4 was familiar with historical and current locations under GARRETT's control, to include properties on "Mifflin," "Hamilton," "Odana," and "W. Karstens."

50. CHS-4 reported that 710 Odana Ln, the "Odana House," had moved to 756 Odana Ln. CHS-4 reported helping move a safe to 756 Odana Ln.

51. CHS-4 was shown historical jail booking photographs and identified Christian GARRETT as "Tone", Sharad WILLIAMS as "JB," Dawayne TILLMAN as "Gucci," Edward MCCLAIN as "Ed," Jerden MONTGOMERY as "D," Tevin NEWELL as "Jo Jo," Jeremy ELISIUS as "Lish," and Adam KILIAN HOVEY as "Chan."

52. CHS-4 was shown historical surveillance photographs taken by the Investigative Team and identified Eric HILSON as "E."

53. CHS-4 reported TILLMAN was a heroin distributor and had recently had a backpack stolen which contained $2,500 worth of heroin and $1,800 of cash. CHS-4 reported

16

TILLMAN "watches when Tone isn't there," believed to be in reference to the KARSTENS RESIDENCES.

54. CHS-4 reported KILIAN HOVEY worked the door at 3722 W Karstens Dr Apt #1.

55. CHS-4 WILLIAMS was currently staying at 3722 W Karstens Dr Apt #1. CHS-4 said they have historically observed "everyone" in apartment #1 holding guns. CHS-4 reported there were no beds in apartment #1, but instead, there were "smoking rooms" for individuals to consume drugs in.

56. CHS-4 later stated the most crystal methamphetamine they observed in 3722 W Karstens Dr Apt #1 at one time was approximately two pounds, the most cocaine or cocaine base they observed was approximately one kilogram, the most marijuana they observed was approximately one kilogram, and the most heroin they observed was approximately 1/2 pound.

57. CHS-4 stated the kilograms of cocaine had a stamp or marking which read "Producted." CHS-4 said an individual named "Monkey D" lived in 3722 W Karstens Dr Apt #4, "E" and "P" are lived in apartment #2, and "Charles" lived in apartment #3. CHS-4 stated "Charles" will secure crystal methamphetamine in apartment #3 when the group is "tightening up."

58. CHS-4 reported that the basement connects the KARSTENS RESIDENCES to 3724 W. Karstens Dr. CHS-4 stated any resident of either address would have a key to freely travel through the basement from one side to the other.

59. CHS-4 reported GARRETT having slept in 3722 W Karstens Dr Apt #1, and Apt #3. CHS-4 reported apartment #3 was where Charles stayed and that Charles was "Part of the team."

60. CHS-4 has seen narcotics inside 3722 W Karstens Dr Apt #2, specifically in late December 2025.

### *Interviews of Sources of Information*

61. The Investigative Team has identified and interviewed SOIs who have provided background information regarding GARRETT and the CGCE as well as more detailed information about the criminal activity being committed by GARRETT and the CGCE that is of investigative interest.

<u>SOI-1</u>

62. On May 28, 2025, the Investigative Team interviewed SOI-1[5] at the Iowa County Sheriff's Office. SOI-1 identified themselves as an ex-girlfriend of GARRETT's, a narcotics user, and a victim of sex trafficking. SOI-1 provided the following information to investigators:

63. SOI-1 identified Christian GARRETT, Jerden MONTGOMERY, and Tevin NEWELL via historical jail booking photographs. SOI-1 identified GARRETT and CORNELIUS as brothers, Mickey Cobra gang members, and narcotic traffickers in the Madison area, specifically selling crack cocaine, cocaine, marijuana, and heroin.

64. SOI-1 reported meeting GARRETT in the spring of 2024. SOI-1 was introduced to GARRETT via MONTGOMERY, whom SOI-1 identified as a Mickey Cobra gang member. SOI-1 reported becoming romantically involved with GARRETT shortly after

---

[5] SOI-1 has a criminal history that includes convictions of possession of drug paraphernalia, theft of property, and possession of cocaine. SOI-1 voluntarily spoke with the Investigative Team with no promises of monetary reward or assurances related to open criminal cases. I believe SOI-1 to be truthful and reliable because a significant amount of information from SOI-1 has been corroborated by other SOIs, CHSs, law enforcement surveillance, and physical evidence to include evidence seized during controlled purchases. Additionally, SOI-1 made statements against their penal interest.

meeting him. SOI-1 reported that GARRETT was brought to the Madsion, WI area by his brother CORNELIUS, who had been trafficking narcotics prior to GARRETT.

65. SOI-1 believed GARRETT was supplied cocaine from somewhere in Chicago. SOI-1 reported GARRETT used "Porchlight" addresses, such as a house on Mifflin Street in Madison, WI and 310 N Hamilton, as well as hotels to distribute narcotics. SOI-1 described GARRETT as being intelligent and having a large enough operation to use sub-distributors. SOI-1 reported that the associates of GARRETT working at the Porchlight properties utilized a "doorman" and countersurveillance techniques, such as squaring the block every hour, to catch police surveillance or suspicious behavior.

66. SOI-1 reported GARRETT utilized associates to transport cocaine and crack cocaine from Chicago to Madison via Greyhound buses.

67. SOI-1 reported two separate times where she traveled to Chicago with GARRETT. During both trips, GARRETT instructed SOI-1 to conceal crack cocaine on her person and transport the narcotics from Chicago to Madison via bus. SOI-1 reported transporting a total of approximately 64 grams of crack cocaine for GARRETT during these two trips.

68. SOI-1 reported being involved in sex trafficking. SOI-1 reported that GARRETT provided free narcotics to women if they gave GARRETT proceeds from their sexual acts with customers. SOI-1 reported GARRETT instructed her to work off a drug debt she owed GARRETT by participating in sex work. SOI-1 was instructed by GARRETT to have the customers either pay in cash or send a payment to GARRETT's Cash App account named "Nino16z." Based on CHS-1 and CHS-3's reporting I believe GARRETT to use the Cash App account $tony16z and believe SOI-1 combined the username of Nino with the account identifier while identifying GARRETT's account name.

19

69. SOI-1 described NEWELL as being an associate of GARRETT who ran 310 N Hamilton St. SOI-1 described MONTGOMERY and Jeremy ELISUS as associates of GARRETT who assisted in narcotic distribution and sex-trafficking. MONTGOMERY was reported to be in charge of bringing women, generally addicts, to hotels, and offering them narcotics if they had sex with men for money. SOI-1 reported that MONTGOMERY was in charge of making sure the sex-trafficking operation ran smoothly.

SOI-2

70. On June 6, 2025, the Investigative Team interviewed SOI-2[6] at the Dane County Jail. SOI-2 identified themselves as an ex-associate of GARRETT's, and a narcotics user. SOI-2 provided the following information to investigators:

71. SOI-2 identified GARRETT, CORNELIUS, NEWELL, MONTGOMERY, and ELISIUS via historical jail booking photographs. SOI-2 reported being introduced to GARRETT by ELISIUS. SOI-2 stated the introduction occurred when GARRETT sold an ounce of crack cocaine to ELISIUS around the month of March 2025. ELISIUS vouched for SOI-2 and GARRETT began using SOI-2 as a driver and a sub-distributor of crack cocaine and fentanyl.

72. SOI-2 reported being paid $100 and 5 grams of crack cocaine per day by GARRETT for his services. GARRETT provided SOI-2 approximately half an ounce of crack cocaine and approximately 5 to 8 grams of heroin to distribute each day. SOI-2 reported 3.5

---

[6] SOI-2 has a criminal history that includes convictions of retail theft, possession of narcotics, possession of drug paraphernalia, and a 2025 arrest for sexual assault resulting in the case being still open. SOI-2 voluntarily spoke with the Investigative Team with no promises of monetary reward or assurances related to open criminal cases. I believe SOI-2 to be truthful and reliable because a significant amount of information from SOI-2 has been corroborated by other SOIs, CHSs, law enforcement surveillance, and physical evidence to include evidence seized during controlled purchases. Additionally, SOI-2 made statements against their penal interest.

20

grams of crack cocaine was sold for approximately $125-$140 and half a gram of heroin was sold for $80.

73. SOI-2 reported driving GARRETT around the Madison area as GARRETT distributed narcotics. SOI-2 reported times where GARRETT would sell from 6:00 AM to 2:00 A.M.

74. SOI-2 identified NEWELL as running 310 N Hamilton St. SOI-2 reported picking up U.S. currency on behalf of GARRETT from NEWELL at 310 N Hamilton. SOI-2 reported the most money he picked up for GARRETT was around $5,000.

75. SOI-2 believed GARRETT traveled to Chicago to re-supply on powder cocaine. SOI-2 provided details on a time in late March or early April 2025 when he was with GARRETT at 310 N Hamilton St. SOI-2 described a tall skinny black male was at the residence with GARRETT and they were in possession of a large bag of cocaine. The unknown male was subsequently dropped off at a Greyhound Bus location. SOI-2 reported GARRETT paying for the male's bus ticket.

76. SOI-2 identified ELISIUS and MONTGOMERY as "enforcers" who would collect drug debts on behalf of GARRETT. SOI-2 reported both ELISIUS and MONTGOMERY had access to firearms. SOI-2 reported ELISIUS also sold low levels of crack cocaine, heroin, and crystal methamphetamine and stayed at 7551 Widgeon Way, Middleton, WI with "Doc." Based on the collective facts of the case described above, I know based off of CHS and SOI reporting that "Doc" is an alias of GUDEX-CROSS and 7555 Widgeon Way to be his residence. I believe that SOI-2 meant 7555 Widgeon Way when they identified Doc's address to investigators.

<u>SOI-3</u>

77. On August 25, 2025, the investigative team interviewed SOI-3[7] at the Dane County Jail. SOI-3 identified themselves as an ex-associate of GARRETT's, and a narcotics user and distributor. SOI-3 provided the following information to investigators:

78. SOI-3 reported that they were originally from Chicago, IL, had lived in Madison for approximately twelve years, and had been using crack cocaine since they were seventeen years old and heroin since 2023.

79. SOI-3 identified Christian GARRETT, CORNELIUS Garret, Tevin NEWELL, Jerden MONTGOMERY, Antanisha BRANCH, and Jeremy ELISIUS via historical jail booking photographs. SOI-3 identified multiple residences that have been controlled by the CGCE to include a house on Mifflin Street, and 310 N Hamilton St.

80. SOI-3 reported narcotic sales and prostitution occurring at the Mifflin Street residence. SOI-3 reported GARRETT and CORNELIUS ran the house. SOI-3 reported personally working the front door and collected drug debts. SOI-3 reported collecting approximately $1100 in drug debts for CORNELIUS.

81. SOI-3 reported GARRETT and CORNELIUS were Mickey Cobra gang members.

82. SOI-3 reported the operation on Mifflin Street moved to 310 N Hamilton St after the Mifflin Street residence was raided by the police. SOI-3 reported 310 N Hamilton St was a Porchlight property. SOI-3 reported NEWELL, who was brought to Madison from Chicago by GARRETT, was in charge of 310 N Hamilton St. SOI-3 reported the front

---

[7] SOI-3 has a criminal history that includes convictions for battery, disorderly conduct, strangulation and suffocation, drive a vehicle without consent, battery or threat to judge, prosecutor, or law enforcement officer, retail theft, possession of cocaine, resisting or obstructing an officer, and criminal damage to property. SOI-3 voluntarily spoke with the Investigative Team with no promises of monetary reward or assurances related to open criminal cases. I believe SOI-3 to be truthful and reliable because a significant amount of information from SOI-3 has been corroborated by other SOIs, CHSs, law enforcement surveillance, and physical evidence to include evidence seized during controlled purchases. Additionally, SOI-3 made statements against their penal interest.

door of 310 N Hamilton was operated by a doorman who would take customer's money. The narcotics were subsequently retrieved from a bedroom on the left-hand side of the front door. SOI-3 reported a time when she assisted NEWELL "bag up" approximately three ounces of crack cocaine into $20- and $50-dollar increments. SOI-3 reported NEWELL possessing a black Glock handgun.

83. SOI-3 reported times when GARRETT sold narcotics inside of 310 N Hamilton to include a time when GARRETT took out three "bricks" of cocaine, which I know based off my training, experience, and knowledge of this case to mean three kilograms. SOI-3 reported GARRETT cooked crack cocaine.

84. SOI-3 reported at the time that BRANCH was pregnant with GARRETT's child and lived on Milwaukee Street in Madison, WI. Investigators are not aware of BRANCH having a child since SOI-3's interview. SOI-3 reported BRANCH was a drug dealer and a pill addict. SOI-3 reported introducing GARRETT and BRANCH.

85. On January 7, 2026, members of the Investigative Team interviewed SOI-3 inside of the Dane County Jail. SOI-4 reported GARRETT controlled the KARSTENS RESIDENCES which included four apartments. SOI-3 informed investigators GARRETT got the landlord of the KARSTENS RESIDENCES to agree to move out some of the tenants in the KARSTENS RESIDENCES in exchange for three months' rent. SOI-3 stated the landlord kicked out an individual named "Mike," his children, and dogs from the unit, which is believed to be 3722 W Karstens Dr Apt #2 based on surveillance of the KARSTENS RESIDENCES.

86. SOI-3 described 3722 W Karstens Dr Apt #1 as being "Chen's" apartment who investigators know from this investigation to be Adam KILLIAN-HOVEY. SOI-

3 stated "E" is also in apartment #1 and is the "doorman." SOI-3 also provided the names "Pops" and "Eric" for "E."  SOI-3 described "E" as a bald-headed black male. SOI-3 stated "E" also bags up product.

87.    SOI-3 reported the individuals in 3722 W Karstens Dr Apt #3 buy drugs from GARRETT. SOI-3 described apartment #4 as being "Monkey D's" residence, who investigators know to be Mark YOUNG based on the investigation.  SOI-3 stated apartment #4, historically, was the residence GARRETT used to operate from.  SOI-3 stated GARRETT now pays YOUNG to remain quiet after GARRETT moved to apartment #1.

88.    SOI-3 identified Sharad WILLIAMS via a historical booking photograph and reported WILLIAMS grew up with SOI-3. SOI-3 reported WILLIAMS was running "Odana" for GARRETT. SOI-3 stated they had purchased drugs from WILLIAMS at 710 Odana Ln., Madison, WI. SOI-3 said that girls are able to "work" out of "Odana,' in reference to prostitution, and the girls purchase drugs from members of the CGCE and are not allowed to purchase drugs from anyone else. SOI-3 said the girls have to give a "cut" for every "trick" and the money goes towards getting drugs and the girls will either owe money for the drugs prior to their "calls" or they'll complete the "calls" and subsequently purchase drugs.

89.    Based on my training and experience, a "cut," in the above context, is a portion of the proceeds from sex trafficking.  A "trick" is a paid engagement of a sexual act with a client.  Finally, a "call" is a paid appointment or encounter between a sex worker and a client.

24

90.	SOI-3 reported around Thanksgiving of 2025, SOI-3 traveled to Chicago, IL with GARRETT. SOI-3 stated they traveled back to Madison, WI the Sunday after Thanksgiving, November 30, 2025. SOI-3 said there were two book bags full of drugs that GARRETT brought back with him. SOI-3 estimated there were two "bricks" of cocaine and two "bricks" of heroin within the book bags in addition to a smaller, prepackaged amount of cocaine base that GARRETT provided SOI-3 a portion of. SOI-3 reported upon arriving back in Madison GARRET first stopped at the "Odana Lane address," 710 Odana Ln., Madison, WI. SOI-3 said GARRETT gave WILLIAMS one "brick" of cocaine and one "brick" of heroin. SOI-3 reported that after some time, GARRETT ordered an Uber and they traveled from Odana Lane to the KARSTENS RESIDENCES where the remaining "bricks" of cocaine and heroin were provided to a black male with dreadlocks. SOI-3 was shown a surveillance photograph taken by the Investigative Team from November 16, 2025, the same photograph of a black male with dreadlocks that was shown to CHS-4. SOI-3 identified the individual in the photograph as the individual who received the "bricks" of cocaine and heroin. This same individual was the individual identified by CHS-4 as "P" or "Rico" who was reported to be living in 3722 W Karstens Dr Apt #2.

91.	Based on my training and experience a "brick" of cocaine or heroin is also one kilogram of cocaine or heroin.

SOI-4

25

92. On October 27, 2025, the Investigative Team interviewed SOI-4[8] at the Dane County Jail. SOI-4 identified themselves as an ex-associate of GARRETT's. SOI-4 provided the following information to investigators:

93. SOI-4 identified Christian GARRETT, CORNELIUS Garrett, Tevin NEWELL, Jerden MONTGOMERY, Jeremy ELISIUS, and Sharad WILLIAMS via historical jail booking photographs.

94. SOI-4 reported GARRETT and others within the organization are part of the Mickey Cobra gang. SOI-4 reported that they had worked security for GARRETT and also stole items at the request of GARRETT, such as safes that were installed at GARRETT's controlled properties.

95. SOI-4 reported that GARRETT ran an organization in Madison that utilized multiple houses to sell narcotics and sex-traffic women to include 710 Odana Ln, a house owned by a subject named "Doc," and unspecified addresses on the following streets, "Karstens," "Hamilton," "Monroe," "Vera Court," and "Russett." Investigators know based on previous CHS and SOI reporting, surveillance, and controlled purchase operations that GARRETT is associated with the following residences in Madison, WI: 3722 W Karstens Dr., 5818 Russett Rd., 7555 Widgeon Way, and 310 N Hamilton St.

96. SOI-4 stated GARRETT controlled the entire building located on Karsten's. Investigators know 3722 W Karstens Dr contains eight apartments. SOI-4 reported 710 Odana Ln had four security cameras and a 2x4 piece of wood that was used to secure the entry door.

---

[8] SOI-4 has a criminal history that includes convictions of trespassing, resisting and officer, possession of THC, unlawful use of phone, disorderly conduct, theft of movable property, and felony bail jumping. SOI-4 voluntarily spoke with the Investigative Team with no promises of monetary reward or assurances related to open criminal cases. I believe SOI-4 to be truthful and reliable because a significant amount of information from SOI-4 has been corroborated by other SOIs, CHSs, law enforcement surveillance, and physical evidence to include evidence seized during controlled purchases. Additionally, SOI-4 made statements against their penal interest.

26

SOI-4 stated GARRETT's associates use handheld radios to communicate with each other while inside the addresses and have developed a code to communicate with each other.

97. SOI-4 reported that anyone at any of the addresses listed above work for GARRETT. SOI-4 reported firearms being at each of the addresses under GARRETT's control and that the firearms originated from Chicago.

98. SOI-4 reported that GARRETT provides women with narcotics and then expects the women to sell sexual acts and pay him a portion of their proceeds to cover the drug debt. SOI-4 reported the women post themselves online seeking clients, primarily through a website named Skip the Games. SOI-4 reported 710 Odana Ln can have two to twenty women working out of the residence. SOI-4 identified some of the women to include Kristina SULLIVAN.

99. SOI-4 identified MONTGOMERY's role within the organization as a shot caller and head of operations under GARRETT. SOI-4 identified NEWELL as being in charge of the Hamilton St address for GARRETT and also someone who would transport narcotics from Chicago to Madison for GARRETT. SOI-4 identified WILLIAMS as being in charge of 710 Odana Ln under GARRETT. SOI-4 identified ELISIUS is a "hitman" for GARRETT. SOI-4 further reported a person named Ace DAVIS worked for GARRETT.

<u>SOI-5</u>

100. On December 2, 2025, December 4, 2025, December 10, 2025, December 11, 2025, and December 17, 2025, the Investigative Team interviewed SOI-5[9] at the Dane County Jail.

[9] SOI-5 has a criminal history that includes no current convictions but arrests for that involve possession of drug paraphernalia, retail theft, and possession of cocaine. SOI-5 voluntarily spoke with the Investigative Team and discussed the provision of resources, which could include monetary compensation, but no promises of monetary reward were made. The Investigative Team spoke with the prosecutor assigned to SOI-5's open criminal cases but

27

SOI-5 identified themselves as a past drug customer of GARRETT's and a victim of sex-trafficking. SOI-5 provided the following information to investigators:

101. SOI-5 identified Christian GARRETT, CORNELIUS Garrett, Jerden MONTGOMERY, Tevin NEWELL, Sharad WILLIAMS, Edward MCCLAIN, Ace DAVIS, Jeremy ELISIUS, Kristina SULLIVAN, Chrystal CLAPPES, Adam KILIAN-HOVEY, Autumn HOFF, SOI-4, Ardis FUNMAKER, Kayci Jo HUBLE, and other associates of the CGCE via historical booking photographs.

102. SOI-5 reported GARRETT and CORENLIUS were brothers from Chicago who were potentially from an area called "63rd." GARRETT and CORENLIUS were selling narcotics and sex-trafficking women in the Madison, WI area. SOI-5 had known GARRETT and CORENLIUS for approximately two years and maintained a drug customer relationship with both. SOI-5 had primarily purchased crack cocaine from them and their associates.

103. GARRETT and CORNELIUS's organization used multiple locations to conduct their business to include 710 Odana Ln, the KARSTENS RESIDENCES, 5818 Russett Rd, and 310 Hamilton St. SOI-5 believed there was an address on Balsam Rd that was also affiliated to the organization.

104. SOI-5 self-identified as a victim of sex-trafficking. SOI-5 reported that GARRETT provided women narcotics and accrued drug debts to GARRETT. The women were then forced to perform sexual acts to earn money in an effort to pay off the debt. SOI-5 reported having been under the control of GARRETT and his associates off and on for

no promises were made. I believe SOI-5 to be truthful and reliable because a significant amount of information from SOI-5 has been corroborated by other SOIs, CHSs, law enforcement surveillance, and physical evidence to include evidence seized during controlled purchases. Additionally, SOI-5 made statements against their penal interest.

the last year. SOI-5 personally reported being physically harmed, sexually assaulted, or refused further narcotics if they refused to perform the sexual acts.

105. SOI-5 knew that sex-trafficking was occurring at GARRETT's properties to include 710 Odana Ln. SOI-5 stated they had never been trafficked out of the address but identified Autumn HOFF and Kristina SULLIVAN as being trafficked out of the address. SOI-5 stated HOFF was in a bad situation and felt like she couldn't leave.

106. SOI-5 reported that Ace DAVIS had been the most recent associate of GARRETT's to be sex-trafficking SOI-5. SOI-5 reported DAVIS primarily sex-trafficked women out of hotels. DAVIS posted advertisements on a website called Skip the Games on a daily basis. The advertisements included SOI-5's photographs and offered sexual acts in exchange for money. DAVIS included a phone number, often a Text Now number, within the advertisement and controlled the post and the communication with potential customers.

107. SOI-5 reported having no prior contact with the customers prior to them arriving in person. DAVIS communicated with the customer and agreed on the services provided and the price. SOI-5 would be notified by DAVIS of an incoming customer and what was expected of SOI-5. SOI-5 gave an example of having to perform oral sex with customers in exchange for money. SOI-5 stated DAVIS would leave the hotel room while the customer was with SOI-5. DAVIS expected a daily quota of $750. SOI-5 reported the customers paid in cash or via Cash App. If the customer used Cash App, SOI-5 would direct them to send to money to DAVIS's account, identified as $TNTIMSTAYLOR. SOI-5 reported receiving none of the proceeds and that the money eventually went from DAVIS to GARRETT.

108. On January 27, 2026, the Investigative Team interviewed SOI-6[10] at 3722 W Karstens Dr during the execution of a federal search warrant at the property, further described below. SOI-6 identified themselves as a drug customer of "Tones," known to investigators based on CHS and SOI reporting as an alias used by GARRETT. SOI-6 provided the following information to investigators:

109. SOI-6 was staying at 3722 W Karstens Dr #1. SOI-6 knew "JB" and "Tone." Investigators know based on previous CHS and SOI reporting that "JB" is an alias used by Sharad WILLIAMS. SOI-6 had known "Tone" for a longer time than "JB." SOI-6 had dated "Tone" approximately three to four years prior. SOI-6 currently bought drugs from "Tone" and self-identified as a heroin user. SOI-6 described times where they could receive drugs in exchange for doing chores in the apartment.

110. SOI-6 knew they had been posted on a website called Skip the Games. SOI-6 stated they had never created an account on Skip the Games. SOI-6 reported people pay money for other girls' accounts in order to post advertisements. SOI-6 reported their photographs have been used in advertisements that result in the men who show up being robbed by the posters. SOI-6 believed the photographs originated from phones that have been stolen from SOI-6.

---

[10] SOI-6 has a criminal history that includes convictions of burglary, resisting an officer, possession of narcotics, possession of methamphetamine, possession of drug paraphernalia, and felony bail jumping. SOI-6 voluntarily spoke with the Investigative Team with no promises of monetary reward or assurances related to open criminal cases. I believe SOI-6 to be truthful and reliable because a significant amount of information from SOI-6 has been corroborated by other SOIs, CHSs, law enforcement surveillance, and physical evidence to include evidence seized during controlled purchases. Additionally, SOI-6 made statements against their penal interest.

111. SOI-6 believed "Ace," believed by investigators to be Ace DAVIS, posted girls and was "running" girls at "Odana." SOI-6 reported "Ace" was running a woman named Autumn, believed to be Autumn HOFF based on SOI-5's reporting. SOI-6 described "Ace" as violent and described a time where SOI-6 had been choked by "Ace" due to a drug debt. During the incident "Ace" offered to have sex with SOI-6 and to post SOI-6 on Skip the Games.

### Controlled Purchases into GARRETT and the CGCE

112. The Investigative Team has conducted sixteen controlled purchase operations into GARRETT and his associates since March 2025. As a generalization, a controlled purchase utilizing a UCE, who is a sworn law enforcement officer, involves the UCE placing a recorded telephone call or text message to the subject selling controlled substances. The call or text message establishes details such as the amount of drugs to be purchased, the amount the drugs will cost along with a time and location for the meeting. The UCE is provided with pre-recorded U.S. currency along with audio and/or video recording devices to capture the meeting with the subject. The UCE is followed by surveillance units to and from the location of the controlled purchase for their safety. Following the controlled purchase, at a neutral location, the UCE turns over the purchased drugs to controlling investigators for further evidentiary processing.

113. This process for a controlled purchase is applicable to all subsequent controlled purchases as described below including controlled purchases utilizing CHS/s; however, CHS/s are searched by law enforcement before and after controlled purchases for contraband.

114. The following are summaries of the controlled purchase operations carried out into GARRETT and his associates:

31

115. On March 3, 2025, CHS-1 conducted a controlled purchase of 12.5 grams of suspected crack cocaine from GARRETT in exchange for $400 in pre-recorded U.S. currency in Madison, WI. The substance was subsequently field-tested using a TruNarc field test unit and tested presumptive positive for crack cocaine. Prior to the controlled purchase, CHS-1 contacted telephone number (262) 873-0694 and spoke with a male who, based off of previous conversations, CHS-1 recognized as GARRETT. GARRETT arrived and departed the sale location in a GMC terrain with WI registration AYZ-6876. CHS-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF.

116. On March 18, 2025, CHS-1 and a DCNTF UCE (UCE-1) conducted a controlled purchase of 15 grams of suspected crack cocaine and 1.2 grams of suspected fentanyl from GARRETT in exchange for $500 in pre-recorded U.S. currency in Madison, WI. The substances were subsequently field-tested using a Mobile Detect Pouch Multi-Detect field test kit and a Mobile Detect Fentanyl Test kit. The suspected crack cocaine tested presumptive positive for cocaine and the suspected fentanyl tested presumptive positive for fentanyl. Prior to the controlled purchase, CHS-1 contacted telephone number (262) 873-0694 and spoke with a male who CHS-1 recognized as GARRETT. CHS-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF.

117. On March 27, 2025, UCE-1 conducted a controlled purchase of 0.9 grams of suspected fentanyl from GARRETT via a courier, identified via a Dane County Jail booking photograph as Josie DORN in exchange for $200 in pre-recorded U.S. Currency in Middleton, WI. UCE-1 was equipped with a covert recording device during the

32

operation. The audio recording is maintained by the DCNTF. The substance was subsequently field tested using the Mobile Detect Fentanyl Field Test Kit and tested presumptive positive for fentanyl. Prior to the controlled purchase, UCE-1 contacted telephone number (262) 873-0694 and the UCE-1 spoke with a male who identified themselves as "Tony" who then coordinated the controlled purchase. Investigators know the name "Tony" to be an alias of GARRETTs based on CHS and SOI reporting.

118. On April 1, 2025, UCE-1 conducted a controlled purchase of 1.5 grams of suspected fentanyl from GARRETT via a courier, identified via a Dane County Jail booking photograph as SOI-2 in exchange for $100 in pre-recorded U.S. currency in Madison, WI. The UCE-1 was directed to a hotel and subsequently met with an associate, SOI-2, of GARRETT's in the hotel parking lot. UCE-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. The substance was subsequently field tested using the Mobile Detect Fentanyl Field Test Kit and tested presumptive positive for fentanyl. Prior to the controlled purchase, UCE-1 contacted telephone number (262) 873-0694 to set up the purchase and spoke with a male they recognized to be GARRETT. While in the vehicle with UCE-1, SOI-2 told UCE-1 he was "Tony's right-hand man" and that "Tony" was upstairs in the hotel room because someone was upstairs making a purchase. Additionally, SOI-2 pointed to a vehicle in the parking lot with WI temporary registration WH3722C and stated that he and GARRETT used the vehicle to distribute narcotics in the Madison area.

119. On April 7, 2025, UCE-1 conducted a controlled purchase of 3.3 grams of suspected fentanyl and 11.8 grams of suspected crack cocaine from GARRETT, via a courier, identified via a Dane County Jail booking photograph as Antanisha BRANCH in

33

exchange for $550 in pre-recorded U.S. Currency in Madison, WI. UCE-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. The suspected fentanyl was subsequently field tested using the Mobile Detect Fentanyl Field Test Kit and tested presumptive positive for fentanyl. The suspected crack cocaine was tested using the Mobile Detect Field Test Kit and it tested presumptive positive for cocaine. Prior to the controlled purchase, UCE-1 contacted telephone number (262) 873-0694 to set up the purchase and spoke with a male they recognized as GARRETT. While in the vehicle with UCE-1, BRANCH told UCE-1 to be careful because the product was strong.

120. On April 14, 2025, UCE-1 received a text message from telephone number 920-994-7216. The message identified the user of the number as "Tony" and that it was their new number. I know that it is common for drug dealers to change their phone numbers frequently to try and avoid detection. I also know that drug dealers will often send their new number to trusted customers to avoid a lapse in narcotic sales. Based on my training and experience as well as my knowledge of this case I believe GARRETT switched phone numbers and provided his new number to UCE-1 so sales could continue.

121. On April 14, 2025, UCE-1 conducted a controlled purchase of 7.2 grams of suspected fentanyl from SOI-2, in exchange for $400 in pre-recorded U.S. currency in Middleton, WI. UCE-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. The suspected fentanyl was subsequently field tested using the Mobile Detect Fentanyl Test Kit and tested presumptive positive for fentanyl. Prior to the controlled purchase, UCE-1 contacted telephone number (920) 994-7216 to setup the purchase and spoke with a male subject that UCE-1 did not recognize.

34

UCE-1 and the male agreed on a price, amount, and location. Once in the area of the agreed upon location UCE-1 called (920) 994-7216 and spoke with a male subject who UCE-1 recognized, based on previous interactions, as SOI-2. During the controlled purchase, SOI-2 told UCE-1 that they could get UCE-1 an ounce of crack cocaine for $700-750. I believe that SOI-2, who was later interviewed and self-identified as an associate and distributor of GARRETT, sold the fentanyl on GARRETT's behalf.

122. On April 15, 2025, UCE-1 conducted a controlled purchase of 28.0 grams of suspected cocaine base directly from GARRETT in exchange for $800 in pre-recorded U.S. Currency in Madison, WI. UCE-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. The suspected crack cocaine was tested using the TruNarc Field Test Unit and it tested presumptive positive for cocaine. Prior to the controlled purchase, the UCE-1 contacted telephone number 920-994-7216 to setup the purchase and the UCE-1 recognized the male's voice as GARRETT's and as the same voice from the previous controlled purchases. During the controlled purchase, a black male, later identified as GARRETT via a comparison of a jail booking photographs and an IL driver's license photograph of GARRETT, exited the front doors of 6810 Milwaukee Street, Madison, WI. GARRETT entered the front passenger seat of UCE-1's vehicle and completed the sale. After the sale, GARRETT entered the rear passenger seat of a silver Volkswagen crossover SUV, which was identified as an Uber rideshare vehicle. DCNTF surveillance units surveilled the vehicle to N. Hamilton Street. GARRETT exited the Uber and entered the front door of 310 N Hamilton St. Based on my knowledge of this case to included information obtained from

CHSs and SOIs, further described below, I believe GARRETT was moving between CGCE controlled properties.

123. On April 22, 2025, CHS-1 conducted a controlled purchase of 12.5 grams of suspected crack cocaine from GARRETT in exchange for $400 in pre-recorded U.S. currency in Madison, WI. The substance was subsequently field-tested using a TruNarc field test unit and tested presumptive positive for cocaine. CHS-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. Prior to the controlled purchase, CHS-1 contacted telephone number (920) 994-7216 and spoke with a male who CHS-1 recognized as GARRETT. GARRETT directed CHS-1 to 310 N Hamilton St and told CHS-1 he would meet them there shortly. CHS-1 arrived at 310 N Hamilton St prior to GARRETT and was let inside. Surveillance observed GARRETT arrive with an unknown black male and an unknown white male. CHS-1 reported GARRETT had the crack cocaine that was sold to CHS-1 with him when he arrived. CHS-1 reported a subject inside 310 N Hamilton who identified themselves as "Jo Jo" had a room directly to the left of the main entrance. CHS-1 reported seeing a dark colored handgun in "Jo Jo's" waistband. Based on my knowledge of this case to include multiple SOI/s and CHSss identifying NEWELL as "Jo Jo" and the CGCE associate in charge of 310 N Hamilton St, I believe CHS-1 observed NEWELL inside the property with a firearm.

124. On May 8, 2025, UCE-1 conducted a controlled purchase of 29.5 grams of suspected crack cocaine and 2.7 grams of suspected fentanyl from GARRETT, via a courier identified via a Dane County Jail booking photograph as Edward MCCLAIN in exchange for $1,000 in pre-recorded U.S. currency in Madison, WI. UCE-1 was equipped with a

36

covert recording device during the operation. The audio recording is maintained by the DCNTF. The suspected fentanyl was subsequently field tested using the Mobile Detect Fentanyl Field Test Kit and tested presumptive positive for fentanyl. The suspected crack cocaine was tested using the TruNarc Field Test Unit and it tested presumptive positive for cocaine. Prior to the controlled purchase, UCE-1 contacted telephone number 920-994-7216 to setup the purchase. UCE-1 recognized the voice to be consistent with GARRETT's. During the controlled purchase UCE-1 drove to the 300 block of E. Mifflin Street which is close to the area of 310 N Hamilton St. GARRETT called UCE-1 and asked where they were and what they were driving. UCE-1 provided the information. GARRETT, while on the phone with UCE-1, verbally relayed the information to a third party. A subject, later identified by UCE-1 via a historical jail photograph, as MCCLAIN, then exited 310 N Hamilton St and entered the front passenger seat of UCE-1's vehicle. MCCLAIN completed the sale with UCE-1. MCCLAIN was observed by surveillance units entering 310 N Hamilton St after the sale. After the sale, UCE-1 received a telephone call from GARRETT asking if the male, presumed by investigators to be MCCLAIN, had met with the UCE-1.

125. On May 15, 2025, UCE-1 conducted a controlled purchase of 24.9 grams of suspected crack cocaine and 12.0 grams of suspected fentanyl from GARRETT, via a courier, identified via a Dane County Jail booking photograph as Shanne DIXON-MILLER, in exchange for $1,600 in pre-recorded U.S. currency in Madison, WI. The suspected fentanyl was subsequently field tested using the Mobile Detect Fentanyl Field Test Kit and tested presumptive positive for fentanyl. UCE-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF.

37

The suspected crack cocaine was tested using the TruNarc Field Test Unit and it tested presumptive positive for cocaine base. Prior to the controlled purchase, UCE-1 contacted GARRETT via telephone number 920-994-7216 and UCE-1 recognized the voice as being GARRETTs. GARRETT directed UCE-1 to 324 E. Mifflin St., Madison, WI to conduct the controlled purchase. Prior to the controlled purchase, surveillance units observed a dark colored Chevrolet Camaro, parked on Milwaukee Street, an area previously used by GARRETT for drug trafficking. Surveillance units observed the Camaro traveling westbound on Milwaukee Street and eventually parked on the 300 block of E. Mifflin Street around the time of controlled sale. A female, later identified as Shanne Shanta DIXON-MILLER, entered the front passenger seat of UCE-1's vehicle. DIXON-MILLER completed the sale with UCE-1. Shortly after the sale, GARRETT and DIXON-MILLER were observed by surveillance units entering the Camaro and departing the area. A traffic stop was conducted on the Camaro by a Madison Police Officer. The officer, who had no prior knowledge of the controlled purchase, stopped the Camaro for violations against Wisconsin traffic law related to vehicle registration and window tinting. The officer identified the driver of the Camaro as GARRETT. GARRETT told the officer he lived at 6810 Milwaukee St., #205 with his "girlfriend."

126. On June 27, 2025, CHS-2[11], at the direction of the investigative team, knocked on 310 N Hamilton's front door in an attempt to make a controlled substance without first

---

[11] CHS-2 has a criminal history include convictions for Retail Theft, Disorderly Conduct, Burglary, Possession of THC, Possession of Drug Paraphernalia, Criminal Damage, Resisting or Obstructing an Officer, Possession with Intent – Cocaine (>5-15g), Bail Jumping – Felony, Possession of Cocaine, Vehicle Operator Flee/Elude Traffic Officer. CHS-2 is motivated to cooperate for consideration with pending charges from an unrelated Possession of Narcotics arrest. Your complainant believes CHS-2 to be truthful and reliable because information from CHS-2 has provided to law enforcement has been corroborated by other witnesses, law enforcement surveillance, and physical evidence including an audio recording obtained by investigators during CHS-2's controlled purchase as further detailed below.

Case 2:26-mj-00028-WED     Filed 02/12/26     Page 48 of 128     Document 1

contacting GARRETT or one of his associates. CHS-2 was successful and completed a controlled purchase of 3.3 grams of suspected cocaine base from Jerden MONTGOMERY in exchange for $100 in pre-recorded U.S. currency in Madison, WI. The suspected crack cocaine was field tested using the TruNarc Field Test Unit and it tested presumptive positive for cocaine base. CHS-2 was equipped with a covert recording device during the operation.  During the controlled purchase, CHS-2 was surveilled entering 310 N. Hamilton St. Following the controlled purchase, CHS-2 provided investigators with nine baggies of suspected cocaine base.  CHS-2 stated a subject named "D," identified as Jerden MONTGOMERY via a historical booking photograph, took CHS-2's money and provided CHS-2 with the cocaine base that MONTGOMERY retrieved from a back room inside of 310 N Hamilton St.

127. On August 8, 2025, CHS-1 was debriefed and reported to the Investigative Team that GARRETT had changed cellular telephone numbers and provided the new phone number (310) 770-7675 for GARRETT. CHS-1 reported that after being unable to contact GARRETT for a period of time GARRETT reached out to CHS-1 advising them of the new number. CHS-1 reported that there are two main reasons why they'd be unable to contact GARRETT, whether he is making a run to Chicago, or he has switched telephone numbers. CHS-1 further reported that if GARRETT switched telephone numbers, he would contact CHS-1 to advise them of the new number.

128. On August 11, 2025, CHS-1, without contacting anyone prior, knocked on 310 N Hamilton St's front door and conducted a controlled purchase of 1.9 grams of suspected cocaine base from Tevin NEWELL in exchange for $100 in pre-recorded U.S. currency in Madison, WI. The suspected crack cocaine was tested using the TruNarc Field Test

39

Unit and it tested presumptive positive for cocaine base. CHS-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. CHS-1 was dropped off in the vicinity of 310 N Hamilton St by assisting investigators. CHS-1 knocked on the front door of 310 N Hamilton St and was let inside by an unidentified "doorman." CHS-1 met NEWELL inside and completed the purchase. CHS-1 observed NEWELL utilize a first-floor bedroom to retrieve, weigh, and package the crack cocaine that was sold to CHS-1. NEWELL was identified by CHS-1 via a historical jail booking photograph.

129. On August 13, 2025, CHS-1 conducted a controlled purchase of 5.8 grams of suspected cocaine base from GARRETT in exchange for $400 in pre-recorded U.S. Currency in Madison, WI. The suspected crack cocaine was tested using the TruNarc Field Test Unit and it tested presumptive positive for cocaine base. CHS-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. Prior to the controlled purchase, CHS-1 contacted the Investigative Team and reported they had contacted GARRETT via telephone number (310) 770-7675 to set up a drug transaction. CHS-1 reported GARRETT directed CHS-1 to 5818 Russett Rd. When the Investigative Team met with CHS-1 in person, CHS-1 was tasked with making a second call, which was recorded by investigators, to GARRETT via telephone number (310) 770-7675. The second call was made in an effort to confirm the buy while investigators were present. I observed CHS-1 dial telephone number (310) 770-7675 to call GARRETT, which GARRETT answered and confirmed that the buy was still happening. The Investigative Team transported CHS-1 to the buy staging location. CHS-1 then walked to 5818 Russett Rd and called GARRETT a third time via telephone

number (310) 770-7675. CHS-1 was let inside by an unidentified "doorman." CHS-1 was directed to the lower-left unit of the quadplex and met GARRETT inside. GARRETT completed the sale with CHS-1. After the sale, the doorman told CHS-1 they had a lot of "up," which CHS-1 knew to be a common term used for methamphetamine. The doorman told CHS-1 it was $200 per "zip," which CHS-1 knew to mean one ounce, and $2,300 per pound. The doorman told CHS-1 to call "Tone" if they were interested. Based on my knowledge of this case, which includes CHS reporting and SOI interviews, I know the alias "Tone" to be used by GARRETT.

130. On August 15, 2025, CHS-1 conducted a controlled purchase of 58.5 grams of suspected crystal methamphetamine and 8.1 grams of suspected crack cocaine directly from GARRETT in exchange for $640 in pre-recorded U.S. Currency in Sun Prairie, WI. The suspected crack cocaine was tested using the TruNarc Field Test Unit and it tested presumptive positive for cocaine base. The suspected crystal methamphetamine was tested using the TruNarc Field Test Unit and it tested presumptive positive for methamphetamine. CHS-1 was equipped with a covert recording device during the operation. The audio and video recording is maintained by the DCNTF. Prior to the controlled purchase, CHS-1 contacted telephone number (310) 770-7675 and spoke with GARRETT to set up the purchase, which was recorded and monitored by myself and Det. Dan Feeney. I observed CHS-1 dial telephone number (310) 770-7675 prior to the recorded call. CHS-1 was directed by GARRETT to 818 W. Main St., Apt. 324, Sun Prairie, WI to conduct the purchase. After arriving at 818 W. Main St, CHS-1 entered apartment #324 and encountered GARRETT and an associate of GARRET's later identified as CHS-3. GARRETT completed the sale inside the apartment with CHS-1.

41

131. On October 9, 2025, CHS-1 conducted a controlled purchase of 2.2 grams of suspected crack cocaine and a Ruger LCP .380 handgun, Serial Number 372586622, from Jerden MONTGOMERY in exchange for $420 in pre-recorded U.S. currency in Madison, WI. The substance was subsequently field-tested using a #7 Scott Reagent Modified test pouch and tested presumptive positive for cocaine. The firearm was run through internal law enforcement systems and was found to have been reported stolen through the University of Wisconsin-Madison Police Department. CHS-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. Prior to the controlled purchase two recorded phone calls were made by CHS-1 to telephone number (608)-496-0136, known by investigators to be used by MONTGOMERY. CHS-1 spoke with a male who CHS-1 recognized as MONTGOMERY from previous interactions. CHS-1 and MONTGOMERY discussed the narcotic and firearm sale, the location of the sale, and the price. MONTGOMERY directed CHS-1 to the KARSTENS RESIDENCES to complete the sale. CHS-1 was dropped off in the area of the KARSTENS RESIDENCES and surveilled entering the multiplex. After the operation and confirmed by the recording devices CHS-1 reported that they were let inside the KARSTENS RESIDENCES by MONTGOMERY and led to an upper apartment on the left side of the building, which was later identified as 3722 W Karstens Dr, Apartment #3, MONTGOMERY sold CHS-1 the handgun and crack cocaine inside apartment #3. CHS-1 reported MONTGOMERY left the apartment briefly to retrieve the narcotics. During the transaction CHS-1 told MONTGOMERY that they did not want to step on "Tones" toes by buying from MONTGOMERY. MONTGOMERY responded by saying "this is Tones" and "we the same thing." I believe

42

that CHS-1 who has historically bought narcotics exclusively from GARRETT, who is known to use the alias "Tone," was trying to avoid potentially upsetting GARRETT by buying narcotics from someone else. I believe MONTGOMERY's response confirms that MONTGOMERY works with GARRETT and that by saying "this is Tones" he was confirming the narcotics were supplied by GARRETT. While CHS-1 was being debriefed by investigators after the operation they received a phone call from telephone number (310) 770-7675. CHS-1 answered the call and allowed investigators to listen via speaker phone. CHS-1 recognized the male on the phone as GARRETT from pervious interactions. CHS-1 asked GARRETT if he had been the one arriving at the KARSTENS RESIDENCES as they were leaving. GARRETT responded by saying he had been there the whole time.  Based on his answer, and my knowledge of this case, I believe that GARRETT had been in another unit while CHS-1 was with MONTGOMERY. Given MONTGOMERY's statement to CHS-1 about working together with GARRETT, I believe GARRETT supplied MONTGOMERY the narcotics to sell to CHS-1. I observed the incoming call on CHS-1's phone was telephone number (310) 770-7675. The Investigative Team attempted to record the conversation between CHS-1 and GARRETT but due to the duration of the call and the status of the recording equipment a recording was not successful.

132. On October 29, 2025, CHS-1 was debriefed and reported to the Investigative Team that GARRETT had changed cellular telephone numbers and provided a new telephone number, (608) 381-8495, for GARRETT. CHS-1 reported that GARRETT had called CHS-1 and provided the number as his new number. GARRETT told CHS-1 to save the number and not to give it out to anyone.

133. On October 31, 2025, CHS-1 conducted a controlled purchase of 3.7 grams of suspected cocaine base with packaging from GARRETT via an unidentified "doorman" in exchange for $275 pre-recorded U.S. currency in the KARSTENS RESIDENCES. The substance was subsequently field-tested using the TruNarc Field Test Unit and tested presumptive positive for the presence of cocaine base. CHS-1 was equipped with a covert recording device during the operation. The audio recording is maintained by the DCNTF. Prior to the controlled purchase, one recorded phone call, which captured the conversation, was made by CHS-1 to telephone number (608) 381-8495. The call was monitored by Det. Corey Nelson and Det. Adam Kneubuhler. This was confirmed by an active pen register on telephone number (608) 381-8495. CHS-1 spoke with a male who CHS-1 recognized as GARRETT from previous interactions. CHS-1 and GARRETT discussed the narcotic sale. CHS-1 was dropped off in the area of the KARSTENS RESIDENCES and surveilled entering the KARSTENS RESIDENCES. As CHS-1 approached the KARSTENS RESIDENCES, CHS-1 made a telephone call to telephone number (608) 381-8495, which was confirmed by the pen register. This phone call was recorded via the recorder CHS-1 had on their person during the operation which did not capture both sides of the conversation due to its proximity to the telephone. After entering the KARSTENS RESIDENCES, CHS-1 completed the sale with an unidentified "doorman" inside of the KARSTENS RESIDENCES. Following the controlled purchase, CHS-1 contacted GARRETT via telephone number (608) 381-8495, which was confirmed by the pen register. This phone call was not directly recorded, only via the recorder CHS-1 had on their person during the operation which did not capture both sides of the conversation. After CHS-1 returned to the investigative team they reported that

44

they confronted the doorman when they believed they received less crack cocaine then what was expected. The doorman entered 3722 W Karstens Dr, Apt #1 after being confronted and CHS-1 stood outside the apartment door. CHS-1 heard the doorman and a voice CHS-1 recognized as GARRETT speaking to each other inside apartment #1. The doorman then exited apartment #1 with more crack cocaine and gave it to CHS.

### *Title III Interceptions and Associated Surveillance and Enforcement*

134. Throughout the investigation, the Investigative Team identified multiple phone numbers used by GARRETT to conduct his criminal activity. Investigators applied for and executed three Title III search warrant orders to intercept wire communications associated with GARRETT's identified telephones.

135. On October 24, 2025, the Honorable Chief United States District Judge James D. Peterson of the Western District of Wisconsin authorized the interception of wire communications over telephone number (310) 770-7675, utilized by GARRETT.  On October 27, 2025, investigators began monitoring the wire communications over telephone number (310) 770-7675, which revealed that GARRETT shifted his communications to (608) 381-8495.

136. On November 6, 2025, the Honorable Chief United States District Judge James D. Peterson of the Western District of Wisconsin authorized the interception of wire communications over telephone number (608) 381-8495, utilized by GARRETT.  On the same date, investigators began monitoring the wire communications over telephone number (608) 381-8495.

137. On December 19, 2025, the Honorable Chief United States District Judge James D. Peterson of the Western District of Wisconsin authorized the interception of wire and

electronic communications over telephone number (608) 381-8495, and the wire

communications over telephone number (773) 656-2458, both utilized by GARRETT. On

the same date, investigators began monitoring the communications over both telephone

numbers.

138. Throughout the period of TIII interceptions, investigators have monitored pertinent

calls that confirmed GARRETT's criminal activity and his connection to his controlled

properties to include the KARSTENS RESIDENCES and 756 Odana Ln. Additionally,

investigators conducted surveillance and proactive enforcement operations against the

CGCE. Below are examples of these pertinent calls and operations that occurred

simultaneously with the intercepted communications.

139. On November 6, 2025, at approximately 5:32 p.m., pursuant to a Title III interception of

telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted

an outgoing call to (608) 720-8485, believed to be utilized by Eric HILSON, known to

use the alias of "E" based on SOI and CHS reporting and based on other interceptions

where the user of (608) 720-8485 is identified by GARRETT as "E." Based on

interceptions, CHS and SOI reporting, and the Investigative Team's knowledge of the

case, HILSON is believed to be a drug associate of GARRETTs and a doorman at the

KARSTENS RESIDENCES. During the conversation GARRETT and HILSON discuss

money and Cash App transactions. Below is a transcription of the pertinent sections of

the conversation between GARRETT and HILSON.

- Hilson: Yeah hello.
- Garrett: (Unintelligible)
- Hilson: Hello.
- Garrett: Yeah, how is everything going?
- Hilson: It's moving man, I'm causing action man. Over three hundred and twenty dollars or something like that.

46

- Garrett: That's it?
- Hilson: Yeah, so far, then you got your cash apps. Check your cash apps. (Unintelligible). Ain't nobody here but (Unintelligible). Everything moving, I got everything moving (Unintelligible). Get it get it to ya, see ya. Why did they come here.
- Garrett: Alright, ok.
- Hilson: See ya when you get here.
- Garrett: Alright.

140. Based on CHS and SOI reporting investigators know that GARRETT and the CGCE often use "doormen" to facilitate drug trafficking. Doorman have been described as subjects who stay near the drug trafficking location's front door and filter customers. I believe that HILSON, the caller, is a doorman at the KARSTENS RESIDENCES located at 3722 W. Karstens Dr, a location used by GARRETT to distribute narcotics. I believe GARRETT and HILSON were discussing the sales being conducted on GARRETT's behalf. I believe that HILSON had earned $320 in cash and additional money via Cash App which had been routed to GARRETT's account.

141. On November 8, 2025, at 4:30 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an incoming call from (608)354-8808, used by Autumn HOFF. Below is a transcription of the conversation between GARRETT and HOFF:

- Hoff: Hey, its Autumn, ughh [UI] Autumn, not OG Autumn, um question, do I have any credit with you?
- Garrett: What you trying to do?
- Hoff: Um, go see Andy like a ball of C and a gram of D.
- Garrett: Its going to be double they don't pay.
- Hoff: Uh, How many days you give me to pay that off then.
- Garrett: [UI] You need to pay that by end of the day.
- Hoff: You give me until midnight tonight?
- Garrett: Yeah.
- Hoff: Alright, uh where you at?
- Garrett: [UI]
- Hoff: Huh?
- Garrett: I'll text you the address.

142. Based on my training and experience, when HOFF asked GARRETT if she had any "credit" with him, she was asking if she had the ability to obtain more drugs without paying money up front. Additionally, when HOFF stated, "a ball of C and a gram of D," I believe she was requesting 3.5 grams of cocaine and one gram of heroin/fentanyl from GARRETT.

143. On November 9, 2025, at approximately 10:00 a.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing call to (608) 961-3137, believed to be utilized by Kristina SULLIVAN, based on open record searches and other interceptions where the user of (608) 961-3137 is identified by GARRETT as "Krissy," a known alias of SULLIVAN. During the conversation GARRETT discusses SULLIVAN moving some of her stuff, believed to be where GARRETT is located. Below is a transcription of the pertinent sections of the conversation between GARRETT and SULLIVAN.

- Garrett: You ready?
- Sullivan: Yeah, I'm ready.
- Garrett: Alright. Get your, uh, stuff.
- [Parties talk over each other]
- Sullivan: [UI] on the way. It's not all. I'm going to start putting it together. Yeah, I'm going to start packing it, yeah.
- Garrett: You ain't gotta bring all that stuff over here at once.
- Sullivan: No, I know I'm not, just grabbing some stuff I need, for sure.
- Garrett: Alright, okay. Grab that and let me know. I'm call an uber.

144. As described earlier, GARRETT is believed to be facilitating sex-trafficking within properties under his control. Additionally, SULLIVAN is believed to be a sex-worker based on open- source advertisements located on the website Skip the Games, a website that allows people to advertise services, often involving sexual acts for money, which feature SULLIVAN's phone number and photographs that match historical booking

photographs of SULLIVAN. Precision GPS ping data associated with the TIII interception mapped GARRETT's telephone in the area of the KARSTENS RESIDENCES at the time of the intercepted call. The uncertainty of the ping was .80 miles. Investigators do not believe GARRETT has another controlled property within that radius on the Northeast side of Madison. Based on the conversation above, future interceptions described further below, and the ping data I believe GARRETT was facilitating sex-trafficking by having SULLIVAN move to the KARSTENS RESIDENCES.

145. Also on November 9, 2025, at approximately 11:00 a.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an incoming call from (608) 961-3137, believed to be utilized by Kristina SULLIVAN. During the conversation SULLIVAN and GARRETT discuss someone being "out." From the context of these calls and investigation, I believe this to mean that someone has ran out of controlled substances. Below is a transcription of the pertinent sections of the conversation between GARRETT and SULLIVAN.

- Sullivan: Alright, I'm coming. Here I am. I'm going to go out there right now. Like can you open, can you? Yes, it's Tone. Oh yeah. Huh?
- [Third party talking believed to be on Sullivan's line]: He's out.
- Sullivan: He's out, Tone, uh Tone I'm supposed to tell you that he's out.
- Garrett: Which way you doing it?
- Sullivan: What?
- Garrett: That's what you was doing?
- Sullivan: I'm supposed to tell you that he's out.
- Garrett: Alright man, the Uber outside bro.
- Sullivan: Alright, did you hear me?
- Garrett: Yeah, I heard you.

146. I believe based on my training and experience and knowledge of this case, that drug distributors often have multiple locations under their control. I know based on CHS and

SOI reporting that GARRETT control's and historically controlled multiple locations, Based on SULLIVAN's statement "I'm supposed to tell you that he's out" and the next call GARRETT makes, described further below, I believe that one of GARRETT's controlled properties, in this case, 710 Odana Ln, was out of narcotics and needed a re-supply.

147. Also on November 9, 2025, at approximately 11:17 a.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing call to (608) 720-8485, believed to be utilized by HILSON. During the conversation GARRETT and HILSON discuss packaging "cookies" and sending them via Uber, a ride sharing company, to "her." This conversation is believed to be directly related to the call referenced above where SULLIVAN tells GARRETT someone is "out." Below is a transcription of the pertinent sections of the conversation between GARRETT and HILSON.

- Garrett: Yeah.
- Hilson: Hello.
- Garrett: How many uh, how much uh, how many of them cookies I got left?
- Hilson: Alright, who you taken [UI]
- Garrett: Huh?
- Hilson: Let me see.
- [background noise]
- Garrett: Hey, you know that black, the Nike bag, go in that Nike bag, Gucci Nike bag, grab that uh that uh work out of that, should be a 63.
- Hilson: Alright okay.
- Garrett: And put it in one of those cereal boxes, one of them old cereal boxes.
- [Talking over each other]
- Garrett: You know how I do it, put it in a cereal box -
- Hilson: Yeah.
- Garrett: Stuff it in there put a little cereal over it and jam the motherfucker up. Put like a couple bags of chips in there.
- Hilson: Yeah.
- Garrett: And let me know when you do that and I'm gonna call an Uber.
- Hilson: Alright.

- Garrett: I need to send that to her.
- Hilson: Alright. Okay. I see a flat piece in hear [UI], Alright I'm gonna go do that now, put it in the cereal box.

148. I know based on my training and experience and my knowledge of this case that crack cocaine is "cooked," or created from powder cocaine. The crack cocaine is often cooked into puck like discs that are then later broken apart and sold. I know based on CHS and SOI reporting that the puck like disc is often called "cookies." I know based on SULLIVAN's earlier call that GARRETT was made aware by an associate that someone was "out." I believe that GARRETT informed his associate, HILSON, of this situation and asked him to assist in re-suppling the location. I believe GARRETT instructed HILSON to conceal 2.25 ounces of crack cocaine or a "63" inside a cereal box when he stated, "Stuff it in there put a little cereal over it and jam the motherfucker up. Put like a couple bags of chips in there." I know that Uber is a ride sharing company. I know that Uber offers a service called Uber Courier, which is a local package delivery service.

149. Physical surveillance was established at the KARSTENS RESIDENCES after the interception of GARRETT's call to HILSON. Surveillance units observed an older male subject exit the KARSTENS RESIDENCES with a grocery style bag after the intercepted call and deliver the bag to an Uber driver. A photograph of HILSON was captured. Surveillance units then followed the Uber vehicle to 710 Odana Ln where the package was delivered to a subject who appeared to have similar characteristics as Sharad WILLIAMS a/k/a "JB", a known associate of the CGCE. I believe, based on the above, that GARRETT re-supplied his sub-distributors operating out of 710 Odana Ln.

150. Also on November 9, 2025, at approximately 11:35 a.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators

51

intercepted an outgoing call to (608) 961-3137, believed to be utilized by SULLIVAN. During the conversation SULLIVAN and GARRETT discuss SULLIVAN being "upstairs" and that she has a "call coming in at 12:30," and that SULLIVAN is not supposed to tell anyone about the spot unless they're spending money. Below is a transcription of the pertinent sections of the conversation between GARRETT and the caller, believed to be SULLIVAN.

- Sullivan: I'm upstairs.
- [Later in the conversation]
- Sullivan: Are you downstairs?
- Garrett: I gotta get, no, I go [UI] TV, I gotta have it put this bed [UI]
- Sullivan: Oh okay, I have a call coming in at 12:30.
- Garrett: What over there?
- Sullivan: Yeah.
- Garrett: Alright okay
- Sullivan: Just making sure that's cool.
- [Later in the conversation]
- Garrett: You good?
- Sullivan: Yep, I'm good.
- Garrett: You don't let no niggas know about that location unless they spending money.
- Sullivan: Okay, I won't.

151. I know based on my knowledge of this case and CHS and SOI reporting, along with electronic and physical surveillance that the KARSTENS RESIDENCES located at 3722 W Karstens Dr are a multi-unit apartment complex with two apartments upstairs and two apartments' downstairs. I know based on the same sources that GARRETT is utilizing multiple apartments within the complex to facilitate his criminal activity. I believe SULLIVAN was referencing multi-apartments being used by GARRETT when she stated, "are you downstairs" and "I'm upstairs. The KARSTENS RESIDENCES are single floor units but CHSs reported that GARRETT has control of all units within the

52

complex to include the upstairs units and the downstairs units. As described earlier, GARRETT is believed to be facilitating sex-trafficking within properties under his control. Additionally, SULLIVAN is believed to be a sex-worker based on open- source advertisements located on the website Skip the Games, a website that allows people to advertise services, often involving sexual acts for money, which feature SULLIVAN's phone number and photographs that match historical booking photographs of SULLIVAN. I know based on my training and experience that sex-workers often use code terms to conceal their true work. I know that the term "call" or "date" are terms often used to refer to a meeting with a client who is paying for sexual acts. I believe SULLIVAN took the Uber referenced by GARRETT in interceptions earlier in the day from 710 Odana Ln to the KARSTENS RESIDENCES. I believe SULLIVAN calls to notify GARRETT that she intends to use the apartment for sex-work when she states, "Oh okay, I have a call coming in at 12:30." I also believe that GARRETT is assisting SULLIVAN and facilitating the sex-work when he states, "You don't let no niggas know about that location unless they spending money." Based on precision GPS ping data related to the TIII interceptions I believe GARRETT left the KARSTENS RESIDENCES prior to SULLIVAN's arrival. The data showed GARRETT traveling south near the area of Interstate 90 at the time of the interception.

152. Also on November 9, 2025, at approximately 1:55 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing call to (608) 961-3137, believed to be utilized by SULLIVAN. During the conversation SULLIVAN and GARRETT discuss SULLIVAN's "call" and how the subject was going to come back the next day because they wanted a bed to

53

cuddle on. This conversation is believed to be related to the previous call detailed above.

Below is a transcription of the pertinent sections of the conversation between GARRETT and SULLIVAN.

- Sullivan: Hello?
- Garrett: Yeah. How everything going?
- Sullivan: Good. Are you back yet?
- Garrett: Did the call come?
- Sullivan: Uh, yeah, he did come, but he wanted a bed so he's going to come back tomorrow.
- Sullivan: He wanted to cuddle with me.
- Garrett: Hmm.
- Sullivan: Hmm.
- Garrett: Alright. [Unintelligible] Imma get it together.
- Sullivan: What?
- Garrett: I said, Imma get it together.
- Sullivan: Yeah are you downstairs?
- Garrett: No, why?
- Sullivan: Cause I want to come see you.
- Garrett: Alright [Unintelligible] give me a second.  [Unintelligible] see if he put something together.

153.     I believe that the conversation above was in reference to SULLIVAN's earlier conversation with GARRETT related to a "12:30 call." I believe that GARRETT asked SULLIVAN if the customer showed up to the call when he asked, "Did the call come?" I believe that the customer showed up but requested a service that couldn't be provided when SULLIVAN states, "Uh, yeah, he did come, but he wanted a bed so he's gong to come back tomorrow." I believe GARRETT was planning to provide a bed for Sullivan when he said "Alright. [Unintelligible] Imma get it together." Based on precision GPS ping data related to the TIII interceptions I believe GARRETT was in the area of Rockford, IL at the time of the call. Specifically, near the Hardrock Casino, which is mentioned in future interceptions as a place GARRETT and his associates frequent.

54

154. Also on November 9, 2025, at approximately 6:04 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing call to (608) 720-8485, believed to be utilized by HILSON. During the conversation GARRETT and HILSON discuss GARRETT having to "cook," and HILSON counting how much narcotics were left, and a potential narcotic's transaction. Below is a transcription of the pertinent sections of the conversation between GARRETT and HILSON.

- Hilson: Aye man, you come back, you might have to cook up man, uh, bag the rest of your stuff up. I got- I got like-
- Garrett: Ok, so, let me see-
- Hilson: -five more purple fifty's left, I mean five of the good bags left, I got some D left too, I got plenty of D left. [Unintelligible] and bag 'em up.
- Garrett: I messed up.
- Hilson: [Unintelligible] put it on a scale.
- Garret: Hol' up, hol' up.
- Hilson: [Unintelligible] put it on the scale, yep, uh- let me see. I got 6.8
- Garrett: [Unintelligible] You got 68 grams?
- Hilson: I got 6 grams of C, I got 5 bags of that dub but, a girl coming through for 100 dollar piece, you want me to take it into the kitchen, I'm a give uh- two of those bags.
- Garrett: Yeah [Unintelligible] lets get uh, Don't give her no ball
- Hilson: No no, I aint got no more- I'm out of those

155. Based on my training and experience and knowledge of this case, I believe the above conversation includes GARRETT and HILSON discussing their narcotic supply. I know based on CHS and SOI reporting that the term "D" is commonly used to refer to heroin and the term "C" is commonly used to refer to crack cocaine. I also know that crack cocaine is created by what drug users and distributors call "cooking," a chemical process of converting powder cocaine into crack cocaine. Additionally, I know that drug distributors often use plastic bags to package narcotics, to include heroin and crack

cocaine.  I believe the above conversation involves HILSON informing GARRETT he may have to make more crack cocaine due to a low supply, "Aye man, you come back, you might have to cook up man, uh, bag the rest of your stuff up" and "I got 6 grams of C."  Based on precision GPS ping data related to the TIII interceptions I believe GARRETT was still near Rockford, IL at the time of the call, therefore, I believe HILSON was running the KARSTENS RESIDENCES for GARRETT in his absence.

156. Also on November 9, 20205, at pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an incoming call from (608) 961-3137, believed to be utilized by Kristina SULLIVAN. During the conversation SULLIVAN asks if she can keep more money after her first "call." Below is a transcription of the pertinent sections of the conversation between GARRETT and SULLIVAN.

- Garrett: Wassup
- Sullivan: So I got a quick question for you, So I just did my first call here and I was wondering if I could keep us a little bit more of the money cuz I need to get some things and, um, also I need to have laundry money. But then still get work.
- Garrett: So you gonna- oh, I can't- I can't talk right now cuz I'm doing somebody
- Sullivan: Oh, I'm sorry- I'm sorry. Garrett: Call you right back

157. Based on previously described interceptions that took place earlier on November 9, 2025, between GARRETT and SULLIVAN and my knowledge of this case, I believe that SULLIVAN had finished a sex act with a paying customer at the KARSTENS RESIDENCES and was requesting to keep more of the proceeds than what was expected. I know that the term "call" or "date" are terms often used to refer to a meeting with a client who is paying for sexual acts. I also know based on CHS and SOI reporting that the CGCE makes women pay a percentage of their profits to back to the CGCE for letting

them use the controlled property. I believe SULLIVAN was requesting to pay less to GARRETT and the CGCE in an effort to buy personal items.

158. Also on November 9, 2025, at approximately 9:33 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing call to (608) 961-3137, believed to be utilized by SULLIVAN. During the conversation GARRETT demands that SULLIVAN open a door. Below is a transcription of the pertinent sections of the conversation between GARRETT and SULLIVAN.

- Sullivan: Hello?
- Garrett: Ay, open this front, open the door right here
- Sullivan: Hello?
- Garrett: Open the door!
- Sullivan: I got that, [UI], on a date

159. Based on previously described interceptions that took place earlier on November 9, 2025, between GARRETT and SULLIVAN and my knowledge of this case, I believe that GARRETT was sex-trafficking SULLIVAN at the KARSTENS RESIDENCES. Based on precision GPS ping data related to the TIII interceptions I believe GARRETT had returned to the area of KARSTENS RESIDENCES. The data at the time of the interception showed GARRETT in the area with an uncertainty of .8 miles. Investigators do not believe GARRETT has another controlled property within that radius on the Northeast side of Madison

160. On November 11, 2025, at 3:03 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an incoming call from telephone number (608) 354-8808, believed to be used by Edward MCCLAIN. The conversation between MCCLAIN and GARRETT is believed to be in

reference to MCCLAIN working at 710 Odana Ln and GARRETT offering him a spot at the KARSTENS RESIDENCES. Below is a transcription of the pertinent sections of the conversation between GARRETT and MCCLAIN.

- [During the beginning of the interception GARRETT asks MCCLAIN how they are treating him over there. MCCLAIN responds by saying "Jo Jo", believed to be NEWELL, had to straighten them out, so they don't disrespect him. MCCLAIN goes on to complain about how much work he does at the spot.]
- [Later in the call]
- Garrett: You want to come over here, [UI], you good?
- McClain: I'm going to come that way but let me go to the hospital, I don't want to get high, give me a week.
- Garrett: Handle your business, take care of your [UI]
- McClain: Okay.
- Garrett: But like I say though, you know I got E over here, standing on business for me, [UI], back and forth you feel me.
- McClain: Yeah.
- Garrett: You know we don't have anyone over there, [UI] you feel me?
- McClain: Yeah that's true.
- Garrett: [UI] over here.
- McClain: And then Monkey D over there, my buddy, be smiling and joking with him.
- Garrett: Who?
- McClain: Monkey D right there.
- Garrett: Man, I got the whole fucking building.
- McClain: I know Tone, you aint gotta tell me, I know.
- Garrett: [Laughing]
- McClain: You ain't gotta say nothing on this phone, nothing.

161. I believe when GARRETT stated, "I got the whole fucking building" GARRETT was informing MCCLAIN that he had control over the KARSTENS RESIDENCES. Based on interviews of CHS-4 and SOI-3, investigators know YOUNG a/k/a "Monkey D" resides in TARGET RESIDENCE #4. Additionally, based on surveillance conducted in November and December of 2025 in conjunction with Title III interception of GARRETT and interviews of CHS-4 and SOI-4, investigators know "E" to be working

at and associated with the KARSTENS RESIDENCES. Lastly, precision GPS ping data related to the TIII interceptions at the time of the call place GARRETT in the area of the KARSTENS RESIDENCES with an uncertainty of .8 miles. Therefore, investigators believe this call is in reference to the KARSTENS RESIDENCES.

162. On November 11, 2025, at 4:33 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an incoming call from telephone number (608) 572-5785, believed to be utilized by Charles WRIGHT based on other interceptions where the user of (608) 572-5785 is identified by GARRETT as Charles and/or Charlie and the voice by the user was believed by investigators to be the same. Additionally, as discussed later in this affidavit, Madison Gas and Electric Company records indicate the telephone number is associated with WRIGHT. The conversation between GARRETT and WRIGHT is believed to be in reference to police activity outside of their location as well as WRIGHT requesting to purchase "a half on D," which is likely in reference to ½ gram of heroin/fentanyl. Below is a transcription of the pertinent sections of the conversation between GARRETT and WRIGHT.

- Wright: Yeah, they still, yeah, they still.
- Garrett: Looking for somebody.
- Wright: I don't know. They on the computer.
- Garrett: Huh?
- Wright: They on they, they on they computer. I don't know what they doing.
- Garrett: Somebody got a warrant or some shit.
- Wright: Yeah, but they sitting there, yeah they still sitting there.
- Garrett: If they, if they watch some shit, they wouldn't make some shit noticeable, you feel me?
- Wright: Yeah, yeah, yeah.
- Garrett: If they looking, they must be looking for somebody.
- Wright: Yep, probably so.

59

- Garrett: Somebody probably got a warrant over here in the building.
- [Later in the Conversation]
- Wright: [Unintelligible] downstairs.
- Garrett: Bro, what you got, what you got, what you got, what you trying to spend?
- Wright: Oh, a half on D.
- Garrett: Go on ahead.

163. I know based on my training and experience and CHS and SOI reporting that the KARSTENS RESIDENCES are located in 3722 W Karstens Dr and made up of four individual apartments with two located upstairs and two located downstairs. I believe, based on my knowledge of the case and CHS and SOI reporting that, "Charles," lives in an upstairs apartment, 3722 W Karstens Dr Apt #3, and was requesting permission from GARRETT to go downstairs, presumably to 3722 W Karstens Dr Apt #1, where investigators know based on CHS and SOI reporting is GARRETT's primary drug distribution apartment, to purchase the ½ gram of heroin/fentanyl.

164. On November 19, 2025, at 2:38 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted a telephone conversation between GARRETT and Joseph HIPLER utilizing telephone number (608) 513-3845. Below is a transcription of the pertinent sections of the conversation between GARRETT and HIPLER.

- Hipler: You at the spot?
- Garrett: Yeah, what's going on?
- Hipler: I'm gonna come see you, I need to see you for like one hard taco and a lil, lil diesel.
- Garrett: Yup, you know where I'm at.
- Hipler: Alright, I'm coming, I'm on my way bro.

165. I know based on my training, experience, and knowledge of this case, which includes CHS and SOI reporting that GARRETT and the CGCE often use code terms to reference

narcotics. I know that "diesel" is a common term used to refer to heroin and that a "hard taco" is a common term to refer to crack cocaine. I believe HIPLER was attempting to set up a drug transaction with GARRETT. The Investigative Team placed surveillance units near the KARSTEN RESIDENCES, GARRETT's last known location, in an effort to observe HIPLER arrive.

166. On November 19th, 2025, at approximately 3:13 p.m., SA Callon Andrews and I observed, via a recorded FBI electronic surveillance camera, a maroon Nissan Sentra arrived in the vicinity of the KARSTENS RESIDENCES and park on W Karstens Dr across from the KARSTENS RESIDENCES. SA Andrews and I were unable to observe if anyone exited the vehicle upon its arrival due to line-of-sight obstructions. At approximately 3:18 p.m., approximately five minutes after the Sentra's arrival, SA Andrews and I observed HIPLER exiting from the front door of the KARSTENS RESIDENCES and enter into the passenger seat of the maroon Nissan Sentra, which subsequently departed.

167. Investigators maintained surveillance of the maroon Nissan Sentra as it departed on November 19, 2025, which was observed to be bearing Missouri vehicle registration NM3W2J.  Dane County Narcotics Task Force UC-250 observed a white female, later identified as Kyra Caldwell, operating the maroon Nissan.

168. The maroon Nissan Sentra is believed to be the same vehicle observed on November 12, 2025, at 12:02 p.m. during a surveillance operation taking place at the KARSTENS RESIDENCES. During that operation HIPLER was observed operating the Sentra. Additionally, this vehicle was known to the Investigative Team as a vehicle HIPLER utilized based on a narcotic arrest made on HIPLER by the Madison Police

Department on November 16, 2025. During the arrest HIPLER was located in the same vehicle.

169. On November 19th, 2025, at approximately 3:34 p.m., Madison Police Department Officer Anthony Ciufo conducted a traffic stop of the maroon Nissan for not having a passenger side mirror affixed to the vehicle, a violation of Wisconsin State Traffic Law. The traffic stop was conducted at Airport Rd off of Hwy 12 in Middleton, WI. Caldwell and HIPLER were found to be occupants inside the vehicle with Caldwell driving and HIPLER seated in the front passenger seat. The vehicle was determined to be a rental vehicle rented under HIPLER's name. During the stop Officers developed probable cause to search the vehicle. In total, 34.8 grams of suspected cocaine/fentanyl and 2.6 grams of suspected Oxycodone powder/fentanyl was located within the vehicle. A large percentage of the suspected cocaine, approximately 32 grams, was found to be in its cooked form, commonly referred to as cocaine base or crack cocaine. Additionally, a crack pipe, a black digital scale, and a drug kit case was located within the vehicle. These exhibits are maintained by the Madison Police Department.

170. Madison Police Department arrested HIPLER for Possession with Intent to Deliver Cocaine, Possession of Narcotics Drugs, Possession of Drug Paraphernalia, and Possession of Cocaine. HIPLER was transported to the Dane County Jail by Madison Police Department.

171. Based on the intercepted call between GARRETT and HIPLER and the subsequent surveillance and arrest I believe that the narcotics seized during the traffic

stop, specifically the crack cocaine and the powder fentanyl, originated from GARRETT and the KARSTENS RESIDENCES.

172. On November 21, 2025, at 2:56 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing call to later identified as CHS-4. This interception was prior to any contact with CHS-4 by the Investigative Team and investigators were still seeking to identify CHS-4. During the conversation GARRETT and CHS-4 discuss what investigators believe to be CHS-4 sub-distributing narcotics for GARRETT. Below is a transcription of the pertinent sections of the conversation between GARRETT and CHS-4.

- CHS-4: Hey what up?
- Garrett: What's you doing?
- CHS-4: Nah, Nah. I'm just making one more run. I got to come back and get some more though.
- Garrett: Shit, at least make like three bucks the ways you driving.
- CHS-4: Dude, I got a pocket full of money now.
- Garrett: Uh.
- CHS-4: I got a pocket full of money now.
- Garrett: Ya.
- CHS-4: Ya. I got to go reup though. Why, you need the whip?
- Garrett: No, you need it. Keep running that money yo.
- [Later in the conversation]
- CHS-4: Hey, thank you again man. You don't know how much I appreciate it.
- Garrett: [Unintelligible]
- CHS-4: [Unintelligible] You're going to see my sales go double, triple maybe even.
- Garrett: Alright.

173. Approximately two hours after the interception from CHS-4, physical surveillance units in the area of the KARSTENS RESIDENCES observed a green van with Wisconsin registration Y1520D arrive in the area of the address. The occupants were observed going into the KARSTENS RESIDENCES, and GARRETT's last known location based on

63

precision ping data related to the ongoing TIII interceptions. The occupants left approximately 17 minutes later in the same vehicle they had arrived in. The Investigative Team believed the occupants were possibly related to the intercepted call above from CHS-4. At that time investigators were unaware of CHS-4's identity or the identity of the user of telephone number used in the interception above.  Surveillance units followed the vehicle, and a Madison Police Officer stopped the van, which was missing a front headlight, a violation against Wisconsin State Traffic Law. The passengers inside the van were identified as CHS-4 and Kaymarie Grant. CHS-4 and Grant were identified, warned, and released.

174. Shortly thereafter investigators intercepted a call believed to be from CHS-4 to GARRETT using the same telephone number as the previous call, in which the subject tells GARRETT they were just pulled over.

175. Investigators know based on their training and experience and their knowledge of this case, that drug traffickers commonly use the term "buck" or "bucks" to refer to $100, investigators also know that sub-distributors often use the term "route" or "run" to refer to selling or transporting narcotics to customers, lastly investigators know that the term "whip" is often used to reference a vehicle. Investigators believe that during the interception prior to the traffic stop that CHS-4 was telling GARRETT that he was making one more narcotics sale before returning to GARRETT to re-supply his narcotics. Investigators also believe that GARRETT was telling CHS-4 he should have made around $300 due to CHS-4's proactive sales with a vehicle that was gifted to CHS-4 from GARRETT. Finally, investigators believe that CHS-4 believed that due to having a vehicle his narcotic sales would double or triple.  Investigators believed that CHS-

64

4 traveled to 3722 W Karstens Dr to re-supply his narcotics and then left shortly after, prior to being stopped by officers. The Investigative Team was primary interested in identifying the occupants of the vehicle and officers did not find independent probable cause to search the vehicle CHS-4 was in.

176. On November 23, 2025, at 5:01 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an incoming call from telephone number (608) 520-2655, believed to be utilized by Mark YOUNG a/k/a "Monkey D," based on future interceptions where Mark YOUNG is identified verbally by GARRETT. Below is a transcription of the pertinent sections of the conversation between GARRETT and YOUNG.

- Young: I need you man.
- Garrett: I'm at the casino. What's going on?
- Young: I need [Unintelligible] a ball of Dino.
- Garrett: What you got?
- Young: Put it on [UI].
- Garrett: Okay I can't do that right now. I'm short. I ain't got no, I ain't got enough work. I'm waiting on my man right now.
- Young: What can you do right now?
- Garrett: Probably a fifty.
- Young: Aight. [UI] I'll be down there.
- Garrett: Alright.
- Young: Okay.

177. I believe based on my training, experience, knowledge of the case, and CHS reporting YOUNG resides in 3722 W Karstens Dr Apt #4. I know based on CHS reporting and my training and experience that "dino" is a common term used to refer to heroin and fentanyl and "ball" is a common term to refer to 3.5 grams of narcotics. When YOUNG told GARRETT, "I need a [Unintelligible], a ball of Dino," I believe YOUNG was requesting to buy 3.5 grams of fentanyl/heroin which would cost approximately $150 to

$250.  When GARRETT responded to YOUNG's question of what he could do right now, and GARRETT responded, "probably a fifty," GARRETT was telling YOUNG he was low on supply of heroin/fentanyl, and he could sell YOUNG $50 worth of heroin/fentanyl. When YOUNG stated, "I'll be down there," I believe YOUNG was coming from apartment #4 and going to apartment #1 inside of 3722 W Karstens Dr, to purchase the fentanyl/heroin from a member of the CGCE.

178.    On November 23, 2025, at 11:30 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing call to telephone number (608) 572-5785, believed to be utilized by WRIGHT. Below is a transcription of the pertinent sections of the conversation between GARRETT and WRIGHT.

- Garrett: Hello, you got some [UI]?
- Wright: Huh?
- Garrett: [UI]
- Wright: Foi?
- Garrett: Foil.
- Wright: Foil, no.
- Garrett: [Speaking to someone in the background: What else you say you needed?]
- Background voice: Rigs.
- Garrett: Rigs.
- Wright: Some rigs, hell no.
- Garrett: The shit motherfuckers try to shoot up with.
- Wright: Yeah I know, no.
- Garrett: Alright, thanks Charles.
- Wright: Yep, yep.

179.    On November 23, 2025, at 11:30 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing

66

call to telephone number (608) 520-2655, believed to be utilized by YOUNG. The following is the conversation between GARRETT and YOUNG.

- Young: Yo.
- Garrett: Got some foil up there?
- Young: No I ain't got none of that, um I got some plastic shit, and some and some [UI].
- Garrett: You got some rigs, the shit motherfuckers shoot up with?
- Young: Ya.
- Garrett: Alright, bring that down here.
- Young: Alright.

180. Based on my training and experience, aluminum foil can be used as a surface used to contain drugs while it is smoked and a "rig" is utilized for cooking heroin/fentanyl. Therefore, I believe GARRETT contacted WRIGHT on behalf of a third-party in an attempt to locate aluminum foil or "rigs" because GARRETT knows WRIGHT is a drug-user in 3722 W Karstens Dr #3. When GARRTT learned WRIGHT did not have any aluminum foil or "rigs," GARRETT reached out to YOUNG in 3722 W Karstens Dr #4. When YOUNG told GARRETT he had "rigs," GARRETT instructed YOUNG to bring the rigs "down," which I believe to be one of the downstairs units within the KARSTENS RESIDENCES. I believe that GARRETT was at the KARSTENS RESIDENCES during these interceptions based on precision GPS ping data related to the TIII interceptions. At the time of the calls, GARRETT was in the area of the KARSTENS RESIDENCES with an uncertainty of .8 miles.

181. On November 26, 2025, at approximately 4:01 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an outgoing call to telephone number (608) 852-6666, believed to be used by Ace DAVIS. During the conversation, GARRETT and DAVIS discuss "Kristy," believed to

67

be Kristina SULLIVAN. Below is a transcription of the pertinent sections of the

conversation between GARRETT and DAVIS.

- Davis: Hello?
- Garrett: Where ya at?
- Davis: Uh, O-odana.
- Garrett: Are you- Is that bitch Kristy over there?
- Davis: Uhh, yup...
- [Shortly after]
- Garrett: Now this is what- here- I'm saying- Listen, this is what I need you to do-
- Davis: Uh-uh.
- Garrett: [Unintelligible] Take that bitch phone, you hear me?
- Davis: Say that again?
- Garrett: Take that bitch phone from her.
- Davis: Say less, say less, say less.
- Garrett: Take that bitch phone boy, you hear me?
- Davis: Say less.
- Garrett: And don't wor- don't fuck with that bitch you hear me?
- Davis: Alright. Say less. I got you.
- Garrett: I want that bitch to starve, you feel me?
- Davis: [Unintelligible] No hoes [Unintelligible].
- Garrett: All I needed was an apology- Stay on the business and I gottchu bro.
- Davis: Say less [radio chirps in background].
- Garrett: [Unintelligible] She gonna lie to me, bro, you feel me? I don't even feel so bad what the fuck [Unintelligible] you don't lie fucking to people, bro.
- Davis: Actually, look cuz. Look bruh I said the same thing [Unintelligible] I said it ain't about [Unintelligible] it's about the lying and deceiving, like, that's some back door shit, like motherfuckers ain't on that.
- Garrett: looking out for that bitch you know what I'm sayin? I want that bitch- I want that bitch sick! You feel me?
- Davis: Say less, cuz.
- Garrett: I got enough problems [Unintelligible] Hit that phone though, right now!
- Davis: I'll fetch it- [Unintelligible] -where do you want me to bring it?
- Garrett: I'll- [Unintelligible] take that bitch, take that phone, come over here and I'll got you something nice.
- Davis: Alright, bet.
- Garrett: Hey, don't give that bitch shit, make that bitch suffer. Not a hit- not no "D", or nothing. Or don't post that bitch.

68

- Davis: Say less. Alright

182. I know based on my knowledge of this case and from SOI and CHS reporting that GARRETT and DAVIS have been reported to be involved in sex-trafficking women. I know that it is common for the CGCE to use websites like Skip the Games to advertise women offering sexual acts in exchange for money. This behavior is generally referred to as "posting." I know that it is common for the women involved in sex-trafficking, specifically related to this case, to be addicted to narcotics, which are provided by GARRETT and his associates. I know based on SOI reporting that if a "working girl" is not paying their drug debts or cooperating with the organization, GARRETT and his associates will withhold further drugs and/or physically abuse the subject. I know, based on previous wire interceptions that Kristina SULLIVAN often goes by the name "Kristy." I also know based on previous wire interceptions and SOI reporting that SULLIVAN is associated with GARRETT, sex-trafficking, and properties run by GARRETT to include 710 Odana Ln and the KARSTENS RESIDENCES. I believe GARRETT was seeking to punish SULLIVAN for potentially lying to him. I know the term "D" is commonly used to refer to heroin. Additionally, I know that heroin users often go through harsh withdrawal symptoms if they suddenly discontinue using heroin or if they are unable to obtain the drug. I believe based on the language GARRETT used he was specifically seeking to withhold heroin from SULLIVAN which would cause SULLIVAN to experience withdrawal sickness, a/k/a become "sick" or "starve." I also believe GARRETT was asking DAVIS to assist in punishing SULLIVAN in exchange for a reward. Lastly, I believe GARRETT was specifically asking DAVIS to not "post" SULLIVAN, meaning to not advertise her online.

69

183. On December 2, 2025, at 8:39 p.m., pursuant to a Title III interception of telephone number (608) 381-8495, utilized by GARRETT, investigators intercepted an incoming call from telephone number (608) 572-5785, believed to be used by WRIGHT. Below is a transcription of the pertinent sections of the conversation between GARRETT and WRIGHT.

- Garrett: You need to stop lettin' all them shiesty ass motha fuckas in there bro. [Unintelligible]. No I'm just saying, BG's and all them motha fuckas, they ain't, nobody should really be up there, that's the whole reason I came over there.
- Wright: You right bro.
- Garret: Because it was quiet, that's what I'm sayin, I don't want all them people around, you feel me?
- Wright: Yeah, you right bro you right.
- Garrett: I'm just tellin you, you know what I'm sayin'?
- Wright: You right, you right.
- Garrett: [Unintelligible]. Too many shiesty motha fuckas. I don't wanna deal with them, I left Hamilton on Hamilton.
- Wright: Yeah you right bro.
- Garrett: You know what I'm sayin'?
- Wright: Yeah, you right, you right, you right.
- Garrett: Let they ass on Monkey D shit, fuck his shit up, you feel me?
- Wright: Yeah, you ain't gotta worry about it no more bro.

184. Based on my knowledge of the case, I believe GARRETT was reprimanding WRIGHT during this call for letting "shiesty motha fuckers" into his apartment, 3722 W Karstens Dr Apt #3, because GARRETT and members of the CGCE utilize apartment #3 to store drugs, specifically large quantities of crystal methamphetamine, as detailed further below. I believe GARRETT was telling WRIGHT he should direct the individuals to "Monkey D's" apartment, 3722 W Karstens Dr Apt #4, because GARRETT and members of the CGCE aren't storing such large quantities of narcotics in apartment #4. I also know that 310 N Hamilton St was a Porchlight property that was under the control of

70

the CGCE. GARRETT and the CGCE used 310 N Hamilton St as a drug distribution spot from early 2025 until all occupants were evicted in October 2025. During the time 310 N Hamilton St was operational surveillance operations and CHS reporting confirmed that low level drug users frequented the address. Around the same time 310 N Hamilton St was closing down the KARSTENS RESIDENCES were reported by CHSs and SOIs to be GARRETT's new controlled property. I believe GARRETT was referring to leaving 310 N Hamilton St for a new spot, the KARSTENS RESIDENCES, when he tells Charles "Too many shiesty motha fuckas. I don't wanna deal with them, I left Hamilton on Hamilton."

185.   On December 23, 2025, at 5:36 p.m., pursuant to a Title III interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an incoming call from telephone number (608) 213-0652, believed to be used by Julia MILES a/k/a "Tripp" based on a verbal identification by GARRETT during interceptions. Below is a transcription of the pertinent sections of the conversation between GARRETT and MILES.

- Miles: Shit, I ain't even gonna lie to you. He um- I'm lowkey pissed about this, like why you ain't tell me what happened? I'm ready to go over there and start bullshit right now!
- Garrett: Who?
- Miles: With JB!
- Garrett: Who's he talking about?
- Miles: The dude who put his hands on him, snatching his dreads out and shit.
- Garrett: Oh, JB beat the shit out of doing that. Who the fuck is he talking about?
- [Later in the call]
- GARRETT: I know. [Unintelligible]. Maybe he beg a motherfucker to stay around right now, cause he gonna fuck- cause we got, we got a whole 'nother crib over there. Like we- I just got another location right down the street, on Mick. Right, right in the area that we at, I got another... crib, a couple of houses down, on Mick.
- Miles: Alright, alright.

186. I believe that during the telephone conversation, MILES and GARRETT were discussing WILLIAMS involvement in a fight with another individual. Based on my knowledge of the investigation, including source reporting and surveillance, I know that WILLIAMS historically distributed drugs from 710 Odana Ln., Madison, WI before WILLIAMS was removed from the residence by another individual. Therefore, during this telephone conversation between GARRETT and MILES, when GARRETT stated, "We got a whole 'nother crib over there. Like we – I just got another location right down the street, on Mick. Right, right in the area that we at, I got another... crib, a couple of houses down, on Mick," I believe GARRETT is referencing 756 Odana Ln. 756 Odana Ln is two buildings south-west of 710 Odana Ln.

187. On December 25, 2025, a Madison Police Department report detailed that Fredrick Gearring told Officer S. Coyne that he had recently been released from prison, had found people running drugs out of his residence, and as a result, kicked people out of 710 Odana Ln., Madison, WI because he believed it was his residence. While Gearring was inside 710 Odana Ln. Officer Coyne contacted him via telephone as Gearring had just approached Officer Coyne on Odana Ln. while he was there for another call for service. While on the telephone, Officer Coyne overhead Gearring interacting with an individual identified verbally by Gearring as "JB," believed to be WILLIAMS, an individual identified verbally by Gearring as "D," believed to be MONTGOMERY. Gearring indicated WILLIAMS had a pistol. Officer Coyne asked Gearring who else was inside and Gearring said "some dude named Tone from Chicago was inside." Gearring told Officer Coyne he took down cameras that were at 710 Odana Ln. and put them in a bag. Precision location information for telephone number (773) 656-2458, used by

72

GARRETT, indicated GARRETT was in Dolton, IL at this time, therefore, believe Gearring was either referring to an unidentified individual as "Tone" or there was someone else present who went by the name "Tone."

188. Within an hour of this occurrence, Autumn HOFF called 911 from telephone number (608) 354-8808, indicating Gearring was threatening to shoot women in the basement of 710 Odana Ln, which was disproven by Officer Coyne. During this time Officer Coyne heard Gearring speaking with "D," believed to be MONTGOMERY, again. Officer Coyne could hear HOFF in the background. Officer Coyne asked Gearring where he was and Gearring said he was now at 756 Odana Ln. Gearring told "D," "D, you run this mother fucker now. I give you that permission. You good." Gearing told Officer Coyne the 756 Odana Ln "was full of tweakers." Officer Coyne asked Gearring if any people were still inside of 710 Odana Ln and Gearring stated WILLIAMS and "Tone" left. Gearring said WILLIAMS had a "bag of drugs" and more specifically, "had a bunch of eight ball and some blue heroin."

189. As a result, investigators believe members of the CGCE no longer had control of 710 Odana Ln. and as detailed above and below, investigators believe the CGCE moved the operation and criminal activities that had been occurring at 710 Odana Ln. to the 756 Odana Ln. Based on this report, physical surveillance of 710 Odana Ln., and Title III interceptions of GARRETT, investigators know the CGCE to utilize cameras on CGCE controlled properties in order to watch for police activity in the area.

190. On December 25, 2025, at 11:52 a.m., pursuant to a Title III interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an outgoing call to telephone number (262) 323-4151, believed to be utilized by Edward MCCLAIN

73

based on a voice comparison with previously intercepted communications and my knowledge of this case. Below is a transcription of the pertinent sections of the conversation between GARRETT and MCCLAIN.

- Garrett: Listen, you know I got, I set this up nicely.
- McClain: Yeah.
- Garrett: I got four, four, four spots, apartments, that's all ours, you feel me?
- McClain: Yeah.
- Garrett: You feel me?
- McClain: Yeah, I'm listening, I'm listening to you. I'm all ears.

191. I believe when GARRETT stated, I got four, four, four spots, apartments, that's all ours, you feel me?" GARRETT was informing MCCLAIN that he had control over the KARSTENS RESIDENCES.

192. On January 4, 2026, at 7:25 a.m., Madison Police Department and Madison Fire Department EMS were dispatched to 3724 W. Karstens Dr. Apt 3, Madison, WI regarding a pulseless, non-breathing individual who was believed to be a heroin overdose victim. 3724 W. Karstens Dr is a set of four apartments located within the same apartment building as the KARSTEN RESIDENCES. 3724 W Karstens Dr is specifically the four apartments on the west side of the building whereas the KARSTENS RESIDENCES, 3722 W Karstens Dr, are the four apartments on the east side of the building. The west side and east side apartments are believed to only be accessible to each other by a common basement. Madison Police Department identified the victim as Louis R. Harris.  Based on my knowledge of this investigation, I know Louis R. Harris to go by the nickname "Mel" or "Melly Mel", and Harris is associated with members the CGCE as he has been intercepted on Title III interceptions with GARRETT's number, telephone number (608) 381-8495.  Harris was pronounced deceased on scene by the

74

Medical Examiner. Pursuant to an Act 79 search, Madison Police Department located 35.4 grams of suspected crystal methamphetamine under a pillow in one of the bedrooms inside the apartment and 2.1 grams of suspected crystal methamphetamine on a tray within the apartment. Madison Police Department arrived on scene at approximately 7:26 a.m. and cleared the scene at approximately 11:56 a.m.

193. On January 4, 2026, at 10:13 a.m., pursuant to a Title III interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an incoming call from telephone number (708) 362-1985, believed to be utilized by Cierra MCGARY. Below is a transcription of the pertinent sections of the conversation between GARRETT and McGARY.

- Garrett: Hello?
- McGary: 3732 [Unintelligible]?
- Garrett: Hello?
- McGary: 3722?
- Garrett: Yeah, you see, you see them police out there?
- McGary: Hell yeah.
- Garrett: Yeah, that's what I thought. My man – he's out front, he right on the –
- McGary: [Unintelligible]
- Garrett: He see you.
- McGary: He can see me?
- Garrett: [UI] Get out the car – they gonna see you.
- McGary: Alright, bet.

194. On the same date, at approximately 10:15 a.m., two minutes after the interception detailed above, an FBI electronic surveillance camera observed an unidentified individual, believed to be MCGARY, walk from the road of W. Karstens to the front door of the KARSTENS RESIDENCES. The individual appeared to be wearing a backpack and immediately entered into the apartment building without waiting outside at the door.

75

195. On January 4, 2026, at 10:20 a.m., five minutes after the arrival of MCGARY at the KARSTENS RESIDENCES, investigators pursuant to a Title III interception of telephone number (773) 656-2458, utilized by GARRETT, intercepted an incoming call from telephone number (872) 275-6232, utilized by an unknown male (hereinafter referred to as "UM6232"). Below is a transcription of the pertinent sections of the conversation between GARRETT and UM6232.

- Garrett: Hello?
- UM6232: What's the word blood?
- Garrett: I'm finna, uh, [UI] my shit just landed. [UI] I'm finna, uh, I'm finna put it together for ya. You in traffic?
- UM6232: Shit, I can be. Shit, I just woke up blood.
- Garrett: Alright, okay. I'm finna, uh [UI] I'mma have you meet up with him.
- UM6232: Alright, bet.
- Garrett: It just got there like this morning.
- UM6232: Yeah, I ain't in no rush blood. I'm waiting on you, shit. Ain't no rush, just trying to hurry up and lock these things down blood. Show you how this shit coming over here boy.
- Garrett: Alright, for sure.
- UM6232: Yep love blood just hit me when you ready.
- Garrett: Alright, love.
- UM6232: Alright.

196. Based on the previously detailed interception and the electronic surveillance camera review, investigators believe MCGARY arrived at the KARSTENS RESIDENCES at approximately 10:15 a.m. and she saw police vehicles in the immediate area due to the overdose investigation occurring at 3724 W. Karstens Dr, as previously detailed. Based on the interception between UM6232 and GARRETT, when GARRETT stated, "my shit just landed," I believed, based on my training and experience, controlled substances – controlled by GARRETT – had just arrived at the KARSTENS RESIDENCES via a drug courier, MCGARY.

76

197. On January 4, 2026, at 4:46 p.m., pursuant to a Title III interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an incoming call from telephone number (872) 275-6232, utilized by UM6232. Below is a transcription of the pertinent sections of the conversation between GARRETT and UM6232.

- Garrett: Where you at anyway?
- UM6232: I'm at, I'm at, I'm in the Elements in Sun Prairie right across from the BP.
- Garrett: You back in the Elements?
- UM6232: Yeah, no I'm back, this where I'm at now. This where my bitch at, so I'm over here.
- Garrett: Oh, you finna get a spot right there?
- UM6232: Hell yeah, this where it's at cause I got because I got a little crib in the three hundred building that I be at you know what I'm saying? Where all the, all the hypes come looking for that shit at, you feel me?
- Garrett: Yeah, alright, I'm finna uh. Tryin see, I'm finna, I'm finna uh probably have my mans put uh in an Uber package and send it that way. You know the Uber package shit?
- UM6232: Nah, hell nah blood.
- Garrett: Yeah, I'm finna put it in an Uber package and put it in a cereal box. Cause I ain't gonna lie, I ain't [UI] I'mma be that way later. I'mma have my man uh give it to you cause my work already down there. I already got some work, my work down, a little bit of work down there.
- UM6232: Right, damn, where you at?
- Garrett: I'm in the city. I'm finna be leaving later on today.
- UM6232: Oh, you still in the raq?
- Garrett: Yeah.
- UM6232: Right, damn, alright so what, what you. I'm saying, like where would I have to go though to go get it?
- Garrett: On the north.
- UM6232: Oh by the north, where?
- Garrett: Over off of Troy.
- UM6232: Nigga, that's where I stay at.
- Garrett: Yeah, over there off Troy. Where you stay at over there?
- UM6232: I stay right behind Kwik Trip boy.
- Garrett: Over there. I gotta, I gotta spot over on Karstens.

77

- UM6232: Yeah I know about, I know about over there. You got you a little spot over there? [Laughs] On Mick, that's where it's at. I ain't gonna lie, my two people there, they got the north side on lock, that's why I ain't really fucking with the north right now.
- Garrett: Yeah, because I be having, I be having the north the last six months. Nobody got shit on lock but me, on Mick, I ain't gonna lie to you.
- UM6232: Yeah [laughs]
- Garrett: I got a whole fucking apartment building.
- UM6232: On Mick, you ain't playing boy.
- Garrett: Yeah.
- UM6232: Not playing. Alright, shit, uh, if anything, shit. You think, you think, you said they ain't got no motion though right.
- Garrett: Yeah, I ain't gonna lie, they ain't got no motion. I'm finna che- that's that why I said, uh.
- UM6232: With that shit you talking about, they ain't gonna open that shit is they?
- Garrett: Hell no, I do that shit all the time.

198. Based on my training and experience, when UM6232 said, "Where all the, all the hypes come looking for that shit at, you feel me?" a "hype" is in reference to a drug-user. Therefore, I believe UM6232 is a drug-distributor operating in the three hundred building of "The Element on Main," a known apartment complex, located at 102 Park Circle in Sun Prairie, WI. During the conversation, GARRETT further details he has a "spot over on Karstens" and he has a "whole fucking apartment building." Therefore, I believe that GARRETT is in control of the entirety of the KARSTENS RESIDENCES. Finally, when GARRETT stated, "Yeah, I'm finna put it in an Uber package and put it in a cereal box," I believe – based on my knowledge of the case – GARRETT intended to instruct a member of the CGCE at the KARSTENS RESIDENCES to place controlled substances in a cereal box, thereby concealing the drugs, and send the cereal box via a package delivery service, Uber Courier, to UM6232. I believe GARRETT suggested this method because the members of the CGCE at the KARSTENS RESIDENCES did not have a vehicle to transport drugs to UM6232, as indicated by GARRETT saying "Yeah,

78

I ain't gonna lie, they ain't got no motion." This is also the same method of drug transportation that GARRETT and HILSON utilized to transfer drugs from the KARSTENS RESIDENCES to 710 Odana Ln, described earlier.

199. On January 4, 2026, at 5:45 p.m., pursuant to a Title III interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an outgoing call to telephone number (708) 362-1985, believed to be used by the suspected female courier, MCGARY. Below is a transcription of the pertinent sections of the conversation between GARRETT and MCGARY.

- McGary: Hello?
- Garrett: Yeah, you good?
- McGary: Yeah, I'm on my way to work.
- Garrett: Man, you gotta go to work now.
- McGary: Yeah, I'm cool though. I slept on my way and I slept on the way back, I'm cool.
- [Later in the conversation]
- Garrett: How everything go out of town?
- McGary: Man, I ain't gonna lie, I ain't even want to leave.
- Garrett: Oh, you ain't wanna leave?
- McGary: Hell nah.
- Garrett: [laughs]
- McGary: [Unintelligible]
- Garrett: Hell nah, you ain't even wanna leave that mother fucker.
- McGary: [Unintelligible] E, P, when he saw who I was damn man [Unintelligible] rolling up back-to-back [Unintelligible] that weed, that weed, back-to-back, back-to-back.
- Garrett: [Unintelligible] he smoking.
- McGary: [Unintelligible] they was cool as fuck. [Unintelligible] then, then two of the peps came in that remember my face. They like [Unintelligible] what's going on?
- [both parties laugh]
- McGary: Oh damn, I'll be back. [Unintelligible]
- Garrett: [Unintelligible] man they mailed that.
- McGary: They did? That's who, that's who it was. Matter of fact, that's who, that's who recognized me, his brother. [Unintelligible] that's exactly who recognized me. The police was out there for [Unintelligible] Yeah, that's what the police was out there, for him. His brother came.

- [Later in the conversation]
- McGary: [Unintelligible] who I was so P had [Unintelligible]man she good, she family man, she good [Unintelligible].
- Garrett: Yeah, that shit crazy as hell. Man I can't believe that shit man.
- McGary: That the whole, that the whole time  he was right in the back.
- Garrett: Yeah, he was in the back.
- [Later in the conversation]
- Garrett: How everything else, you straight? Everything good?
- McGary: Well, yeah, yeah I'm [Unintelligible] for the next one. I'm on point [Unintelligible] I'll do it.
- [Later in the conversation]
- Garrett: Yeah that's why I said I fall asleep, that's why I'm like, you know, they told me you got on the bus [Unintelligible] I'm like that's what's up.
- McGary: Yeah, [Unintelligible] I remember that Uber, he came and I told him I [Unintelligible] Lake St., they already knew what I was talking about, they pulled that shit right up. Shit, I got on that bitch, I paid [Unintelligible] back to Chicago.
- Garrett: Hell yeah, I told you I got you. Any other shit you want to, uh, make, I got you.
- McGary: Hell yeah, anything, I'mma do anything [Unintelligible] every hour so. I'll be able to make it back. And I be on time to work [Unintelligible].
- [Later in the conversation]
- McGary: I was telling that to P and them, I was telling that to P like shutdown means shutdown. Nearly five cars was there, it was only, it was only two when I first pulled up. There was five nigga. It's shutdown, it's shutdown.
- Garrett: Hell yeah.
- [Later in the conversation]
- McGary: I said after I see he was gone for thirty minutes, that's when I Uber back to the motherfucking, uh, Lake St. to the bus.
- Garrett: Yeah. Man, now the landlord had text, tell me the motherfucking gotta be out by the 31st, all type of dumbass shit.
- McGary: [Unintelligible] too hot over there?
- Garrett: [Unintelligible] motherfucking drawing attention.
- McGary: I'm paying you rent nigga.
- Garrett: I just paid rent. I just paid rent.
- McGary: Exactly.
- Garrett: Motherfucker just, motherfucker just paid rent. You talking a motherfucker gotta be out
- [parties talk over each other]
- Garrett: I just paid rent for this [Unintelligible] the 31st.
- [Later in the conversation]

80

- McGary: [Unintelligible] some weed to bring back to Chicago.
- Garrett: Yeah, yeah, [Unintelligible] I had, I had some smokes up.
- McGary: It was, it was like a pound bag.
- Garrett: Yeah.
- McGary: Yeah. [Unintelligible]
- Garrett: That's what's up.
- McGary: Ain't cool, niggas gotta be smooth on that, on that popping that X shit.
- [parties talk over each other]
- Garrett: I don't fuck with no drugs.
- McGary: That's why I was, that's why I was telling him, when y'all working, y'all can't get high like that when working [Unintelligible] all y'all do is roll up.
- Garrett: [Unintelligible] smoke all fucking day bro.
- McGary: [Unintelligible] I was in there for like an hour, hour and a half, if that, maybe, you rolled a whole fat pack.
- Garrett: I know they was in their smoking their damn brains out.
- McGary: [Unintelligible] I told them. I ain't gonna lie to ya. [Unintelligible] trying to be alert nigga, the police outside [Unintelligible].
- Garrett: Hell yeah, ain't got nothing to do with that situation right there.

200. Based on the previously detailed interception in conjunction with the other interceptions, I believe MCGARY traveled from Chicago, IL to Madison, WI via bus, which is what much of the conversation between MCGARY and GARRETT was about. I believed when MCGARY said, "Well, yeah, yeah I'm [Unintelligible] for the next one. I'm on point [Unintelligible] I'll do it," MCGARY was informing GARRETT that she was willing to transport more drugs from the Chicago, IL area to Madison, WI on behalf of GARRETT in the future. Later when GARRETT stated, "Hell yeah, I told you I got you. Any other shit you want to, uh, make, I got you," I believe based on my training and experience, GARRETT was referring to money being paid to MCGARY in exchange for making the trip.

201. On January 5, 2026, at 11:03 a.m., pursuant to a Title III interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an incoming

81

call from telephone number (872) 275-6232, utilized by UM6232. Below is a

transcription of the pertinent sections of the conversation between GARRETT and

UM6232.

- Garrett: Hello?
- UM6232: Yeah, I'm outside blood.
- Garrett: Alright, yep, uh, you prolly got to go right there and ring that fucking doorbell. They [Unintelligible] fucking answering. One of they phone squeaking. Yeah, thirty-seven twenty-two. Go right there and it should be the fourth bell.
- UM6232: The fourth bell from the left?
- Garrett: Uh, yep.

202. Contemporaneously, on the same date, at approximately 11:01 a.m., investigators

observed via FBI installed electronic surveillance equipment, an unidentified individual

wearing blue jeans and a dark colored hoodie, believed to be UM6232, arrive at the front

door of the KARSTENS RESIDENCES. At approximately 11:07 a.m., an unidentified

black male wearing blue jeans and a hoodie, exited the KARSTENS RESIDENCES.

203. Four minutes later, on January 5, 2026, at 11:11 a.m., pursuant to a TIII interception of

telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an

incoming call from telephone number (872) 275-6232, utilized by UM6232. The

following is the pertinent conversation between UM6232 and GARRETT:

- UM6232: Yo.
- Garrett: Yeah.
- UM6232: Yeah, what I was finna say, yeah so he gave me, he gave me twenty-six hard and this only a dub on soft blood.
- Garrett: [UI] I'm finna have him get it together right now.
- UM6232: Yeah, so, man, he gonna have to uh get on top of that blood.
- Garrett: Mhmm.
- UM6232: I ain't trying to be, you know, I'm tying to have all this shit, put all this shit together, get this shit bussin' gang, ain't gonna lie to you gang. And they, why they been in the bitch [UI] hard as hell, beating on the door like that, boy you all in this bitch, dead

blood. What if a motherfucker just kicked that bitch in and y'all been dead like that boy. Motherfucker gotta be up.

- Garrett: How many time do you think I tell that dumbass that shit. In there smoking all that fucking weed, you know I got weed and shit too, you feel me?
- UM6232: Yeah and that's what I was going to tell you, when you, when you bring that shit, I ain't gonna like to you, I need a [UI] blood just so I don't have to be buying no weed. But I'mma pay you for it thought with a motherfucking [UI] get it together. But I definitely gonna need some weed man on Nuk blood. I ain't smoked in three days.
- Garrett: Yeah I'm [UI]
- UM6232: But yeah, I got you blood, so but look when he bring, when he bring the rest of what you, what you want off everything thought so I can, you already know, I can have that shit and order so I can hurry up and get you out the way as this shit come in?
- Garrett: Give me seven hundred a zip.
- UM6232: Seven a zip, alright, bet twenty-eight. Well really three buck cause I need that ounce –
- Garrett: Alright.
- UM6232: Of weed. Alright, say less blood, I got you.
- Garrett: Alright.

204. Based on the previous two interceptions between UM6232 and GARRETT, I believed, based on my training and experience, that UM6232 is a drug distributor who traveled to the KARSTENS RESIDENCES on January 5, 2026, and purchased 26 grams of cocaine base ("hard") and $20 worth of powder cocaine ("soft") when UM6232 stated, "Yeah, what I was finna say, yeah so he gave me, he gave me twenty-six hard and this only a dub on soft blood." Based on the conversation, I believe UM6232 was shorted an amount of drugs; however, when UM6232 is given the remainder of the drugs by a CGCE member, he will owe GARRETT $700 as indicated when GARRETT stated, "Give me seven hundred a zip." Based on my training and experience, a "zip" is an ounce of drugs.

205. Based on the totality of the circumstances and the intercepted communications related to UM6232 and MCGARY, I believe UM6232 is a drug customer of GARRETT's who

83

traveled to the KARSTENS RESIDENCES on January 5, 2026, the day after GARRETT told UM6232 "my shit just landed," which was January 4, 2026. I believe MCGARY traveled via bus from the Chicago, IL area to the KARSTENS RESIDENCES to deliver drugs on behalf of GARRETT on January 4, 2026.

### *Anonymous Tip Regarding 756 Odana Ln*

206. On January 10, 2026, investigators received an anonymous tip regarding sex trafficking and drug use occurring at 756 Odana Ln. Within the anonymous tip, the individual reported they "went to get a massage and ended up getting robbed." The tipster also provided a link to a skipthegames.com posting regarding the female the tipster solicited. The tipster stated the incident occurred on January 6, 2026, at approximately 4:00 p.m. The tipster stated the female and her three fiends walked in and said the tipster needed to leave before they were "serviced" and one of the individuals had a box cutter and was "threatening to use it."

207. Dane County Sheriff's Office Det. Dritan Lazami identified the female in the Skip the Games posting as Autumn HOFF, the same individual who called 911 on December 25, 2025, and reported females were being threatened in 710 Odana Ln. HOFF was also overhead in the background of the call between Gearring and Officer Coyne while Gearring was located at 756 Odana Ln. HOFF has also been intercepted on Title III interceptions with GARRETT requesting to purchase cocaine and heroin as detailed above. Therefore, investigators believe this tip is credible as HOFF's involvement with CGCE and HOFF's location at 756 Odana Ln has been corroborated.

### *Gas and Electric Records for the KARSTENS RESIDENCES*

208. On January 13, 2026, SA Callon Andrews served an administrative subpoena on Madison Gas and Electric Company for records regarding accounts for the KARSTENS RESIDENCES for the timeframe of December 7, 2025, through January 6, 2026, for which records were received on January 21, 2026. As a result, investigators learned there was "no customer in service at this location" for 3722 W Karstens Dr Apt #1. Investigators learned "Michael Smith" was the provided contact information for apartment #2 and apartment #4. Investigators learned "Charles E. Wright," telephone number (608) 572-5785, was the provided contact information for apartment #3.

209. Based on this information, investigators believe the "Charles" referenced by CHS-4 and SOI-3 is Charles WRIGHT. Based on the information from SOI-3, that the landlord of the KARSTENS RESIDENCES kicked out "Mike" from apartment #2, investigators believe "Michael Smith" was the historical resident of apartment #2. Additionally, Madison Gas and Electric Company records indicate the service dates for "Michael Smith" in apartment #2 ceased on December 1, 2025. However, the records indicate that "Michael Smith" is the contact information for apartment #4 beginning on December 1, 2025, through to January 6, 2026, which is the residence believed to be occupied by Mark YOUNG.

### Refuse Search of the KARSTENS RESIDENCES

210. On January 9, 2026, members of the DCNTF conducted a refuse search of the garbage located at the KARSTENS RESIDENCES, including the refuse from 3724 Karstens Dr., Madison, WI as all of the refuse bins are comingled.

211. Det. Nelson met with City of Madison Streets employees. Det. Nelson observed the back of the refuse hauler had no contents in the bed of the truck prior to the refuse collection.

Det. Nelson followed the truck from the predetermined meeting location to the KARSTENS RESIDENCES, including 3724 W. Karstens Dr., Madison, WI. At approximately 7:39 AM, Det. Nelson observed there were numerous trash bins at the street in front of the KARSTENS RESIDENCES. Det. Nelson observed the City of Madison Street employees load each of the trash bins into the back of the garbage truck. At approximately 7:42 AM, the trash collection was completed. Det. Nelson then followed the truck back to a predetermined location where the refuse was searched through.

212. During the search Det. Sgt. Cole Sargent searched a trash bag that contained baggies and two items associated with Kristina SULLIVAN. One of the baggies contained an unknown white powder. One of the items was a torn Chime Financial letter that had "Kristina Su" and "3722 W. Karste Apt 2 Madison, WI 53," believed by investigators to mean Kristina SULLIVAN 3722 W Karstens Dr Apt #2. The other item was a black credit card bearing the name Kristina SULLIVAN. These items were collected by investigators and preserved.

213. As further described below, **TARGET DEVICE #8**, was later located in 3722 W Karstens Dr Apt #2 and is believed to belong to SULLIVAN.

### *Seizure of Drugs at 6810 Milwaukee St.*

214. On January 11, 2026, at 4:49 p.m., pursuant to a TIII interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an incoming call from telephone number (608) 419-0604, believed to be used by Toni WHITE. WHITE is known to investigators to be Antanisha BRANCH's mother. BRANCH is known to be a historic girlfriend of GARRETT'S who is currently incarcerated at the Dane County Jail

86

in Madison, WI. BRANCH has been frequently intercepted communicating with GARRETT via the TIII from jail. BRANCH is also known to investigators as having an apartment located at 6810 Milwaukee St, #205, in Madison, WI. Milwaukee St is commonly referred to as "M Block." Below is a transcription of the pertinent sections of the conversation between GARRETT and WHITE.

- Garrett: This is Tony. How many I take your order?
- White: Um, the order is did you know that the restaurant was closing down today?
- Garrett: What restaurant?
- White: Your girl, your girl, y'all restaurant. Did, did you have anything that you need to pick up?
- Garrett: Yeah, I need to get something. You didn't start moving stuff did you?
- White: Yeah.
- Garrett: You already did?
- White: Yeah and I thought that you was aware.
- Garrett: I got a bag in there.
- White: Where's the bag?
- Garrett: It's in there.
- White: Where?
- Garrett: In the house.
- White: Where at?
- Garrett: Did you start moving stuff out of there?
- White: Ah, there's boxes and stuff. I broke the beds and stuff down.
- Garrett: [Unintelligible] I got some stuff in there.
- White: Where at?
- Garrett: I'mma come over there and get it myself.
- White: How long you finna be?
- Garrett: I'm finna be coming from the city [Unintelligible] I got some important stuff in there. I'm telling you.
- White: Look, don't be, listen. I'm, I'm for, I'm with ya. I'm not against you. I calling you, telling you about y'all restaurant.
- Garrett: I never said you was against me. Listen to me, I never said you was against me. I'm just telling you, before you start getting in and handling your business, let me get in there first, do you feel me?
- White: Business is already handled and that's why I was telling you -
- Garrett: Oh my God.

- White: Was you aware.
- Garrett: Stay on the phone.
- White: The restaurant.
- Garrett: She ain't tell me none of this stuff man. Stay on the phone.
- White: Okay, but listen.
- Garrett: I gotta make a call and see where my brother put that bag at.
- White: It.
- Garrett: I'm finna have them, I'm finna have them -
- White: Listen, listen, listen. I sent something and so so they they I ain't, I didn't seen no bag though, you get what I'm trying to say? I -
- Garrett: That's why I say, I don't know what it's in. I need to call em. Just give me a second.
- White: Okay.

215.    Three minutes later, on January 11, 2026, at 4:52 p.m., pursuant to a TIII interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an outgoing call to telephone number (608) 590-2269, used by Sharad WILLIAMS.  Investigators believe GARRETT conducted a three-way call with WILLIAMS and WHITE as both were intercepted on the telephone call.  Below is a transcription of the pertinent sections of the conversation between GARRETT and WHITE.

- Williams: Uh, it's in the uh, cereal box, captain crunch.
- Garrett: It's in the cereal box, hey cuz, tell her where that stuff at.
- Williams: The cereal box, it's in the cereal box on the fridgerator, the captain crunch one, open.
- White: Okay. So, who coming?
- Garrett: Is that everything in that thing cuz?
- Williams: Huh?
- Garrett: Is everything in there?
- Williams: Yes.
- Garrett: That's all the stuff we got?
- Williams: Yeah.
- Garrett: What the fuck - so all that shit fit in a damn cereal box, man?
- Williams: Yeah.

- Garrett: The ice cream, the ron, and, and the hard?
- Williams: Yeah, I think - I don't know what he did with the ice cream, the little shit, the little shit, that I got is upstairs, though.
- Garrett: Alight okay, momma so clear that cereal box and let me call and make sure he ain't got nothing else in there.
- White: Okay.

216.    Four minutes later, on January 11, 2026, at 4:45 p.m., pursuant to a TIII interception of telephone number (773) 656-2458, utilized by GARRETT, investigators intercepted an outgoing call to telephone number (773) 507-3226, used by an unidentified male (UM3226). Below is a transcription of the pertinent sections of the conversation between GARRETT and UM3226.

- UM3226: Yo.
- Garrett: Hey, why you put all that stuff at, cause her momma moving that stuff out that crib. You just all that stuff in the cereal box?
- UM3226: Yeah, it's in there, it's in the cereal box, I got it.
- Garrett: Huh?
- UM3226: I said yeah, [UI] cereal box [UI]
- Garrett: Where's the ice - where all the ice cream at?
- UM3226: The ice cream is uh, talking about the one from uh, [UI]? [UI] that box.
- Garrett: No, understand.
- UM3226: The ice cream upstairs, the ice cream up stairs in Charles' room.
- Garrett: So all the ice cream upstairs?
- UM3226: Charlie's, in a shoe box, on the shelf in the closet.
- Garrett: Okay, so all that's upstairs.
- UM3226: Yeah.
- Garrett: Alright, okay, and the stuff in the cereal box, that's it.
- UM3226: The stuff in the cereal box, at the uh, uh M Block.
- Garrett: That's what I'm saying, everything in that cereal, that's the only thing that's on M block is the stuff in the cereal box?
- UM3226: The stuff in the cereal box, [UI], a little bit of dino, a little bit of dino told me to bag up for[UI]
- Garrett: I know, I'm saying, it's all in that cereal box, [UI]
- UM3226: All in that cereal box.

- Garrett: Alright cause I'm trying to make sure, just trying to make sure ain't nothing scattered around, she moving, she packing this fucking crib up.
- UM3226: I thought you was the only one that had the key in there?
- Garrett: No, her momma, she just, she finna be moving out of there now, all type of dumbass shit, her momma, and [UI], he just got, he just got robbed.

217. Based on previous TIII interceptions, CHS and SOI reporting, training and experience, and investigators knowledge of this case, the Investigative Team knows that GARRETT has control of the KARSTENS RESIDENCES. Investigators know, based on CHS-4 reporting and Madison Gas and Electric Company records, that an upstairs apartment, apartment #3, is occupied by Charles WRIGHT. Investigators know that "ice cream" is a common term used by GARRETT and his associates to refer to methamphetamine, that "M Block" is a common term used to refer to Milwaukee Street in Madison, WI, and that "dino" is a common term used to refer to heroin and fentanyl. Investigators believe the UM3226 confirmed that the cereal box discussed in the previous interceptions contained some of GARRETT's narcotic supply and that some was also concealed in WRIGHTS's room, believed to be 3722 W Karstens Dr Apt #3.

218. On January 11, 2026, at approximately 5:55 p.m., Madison Police Department Police Officers M. Ramirez and B. Zaruba made entry to 6810 Milwaukee St., Apt. 205, Madison, WI pursuant to an Act 79 search. Officers confirmed that 6810 Milwaukee St. Apt. 205, Madison, WI returned to Antanisha R BRANCH. Officers would also later verify that BRANCH was actively on probation and was Act 79 eligible. Within the apartment, officers encountered WHITE who advised officers she was Antanisha BRANCH's mother, amongst other individuals who were attempting to move items out of the apartment. Later, the officers were joined by members of the Dane County Narcotics Task Force to conduct the Act 79 search. Pursuant to the search,

investigators located 649.4 grams of suspected cocaine base and 62.9 grams of suspected cocaine within a Cap'n Crunch's Crunch Berries cereal box in the master bedroom of the apartment. The seizure prompted Det. Nelson to pause the Act 79 search and apply for a search warrant for 6810 Milwaukee St., Madison, WI, which was later granted. SA David Hall conducted a cocaine swipe test on a sample of the suspected cocaine base. The swipe test was presumptive positive for the presence of cocaine. Pursuant to the search warrant Lt. Johnson located 0.5 grams of suspected cocaine base in a flat iron box on the kitchen counter and a digital scale on the stove in the kitchen. Additionally, mail for GARRETT and BRANCH were located within the apartment with the address of 6810 Milwaukee St., Apt 205, Madison, WI.

219. Later, on January 12, 2026, Det. Nelson received an updated rent roll from the property manager for WinnResidential, the property management company for 6810 Milwaukee St. Det. Nelson observed building 1 (6810 Milwaukee St) Apartment #205 listed Antanisha BRANCH as the sole individual on the lease.

### *Interdiction of Cierra McGary*

220. The Investigative Team using open record searches found the user of 708-362-1985, referenced above, which communicated with GARRETT on January 4, 2026, about a narcotics resupply at the KARSTENS RESIDENCES, to be associated with Cierra MCGARY. Additionally, SA Callon Andrews reviewed administrative subpoena returns issued to Greyhound Bus which sought any information the company had related to the phone number. SA Andrews found the number to be associated with a July 2025 round trip from Chicago to Madison under MCGARY's name. MCGARY's Illinois Driver's License photograph was obtained by the Investigative Team and reviewed for reference.

91

221. On January 7, 2026, the Honorable U.S. Magistrate Judge Anita M. Boor authorized a federal Pen Register Trap and Trace and a Ping GPS warrant for 708-362-1985.

222. On January 24, 2026, investigators observed precision location information (ping) data for the telephone associated with telephone number 708-362-1985 indicated the telephone was traveling northbound from the Chicago, IL area to the Madison, WI area. Specifically, at approximately 11:53 a.m., the telephone was in the immediate area of Union Station Transit Center, located at 505-515 W. Jackson Blvd., Chicago, IL with a degree of uncertainty of 0.1684 miles. At approximately 12:23 p.m., the telephone was in the area of the northeast side of O'Hare International Airport, Economy Lot G at 10000 W O'Hare Ave, Chicago, IL with a degree of uncertainty of 0.6259 miles.

223. At approximately 3:28 p.m., SA Callon Andrews observed a white Coach USA bus indicating it was a Megabus route between Chicago O'Hare and Madison, WI bearing the identifying numbers 67779 on the rear of the bus, traveling northbound on Interstate 90 north of Hwy N. SA Andrews maintained surveillance of the bus to the bus stop located on E. Broadway St. east of Stoughton Ave., in Madison, WI where it arrived at approximately 3:34 p.m. At approximately 3:33 p.m., ping data for the telephone associated with telephone number 708-362-1985 indicated the telephone was in the area of 2600 Waunona Way, Madison, WI with a degree of uncertainty of 1.1684 miles.

224. At approximately 3:39 p.m., the bus departed the bus stop and traveled westbound on Hwy 18 until it ultimately arrived at the bus stop located on N. Lake St. south of W. Johnson St. at approximately 3:53 p.m. Based on my review of MCGARY's Illinois Driver's License Photograph referenced above, I observed and identified MCGARY exit the bus with a black backpack on her back. Contemporaneously, ping data for the

92

telephone associated with telephone number 708-362-1985 indicated the telephone was in the area of 140 Proudfit St., Madison, WI with a degree of uncertainty of 0.8763 miles.

225. Det. Nick Cleary and I observed MCGARY enter into a silver Dodge Caravan bearing WI vehicle registration AJJ7448. Investigators maintained surveillance of the Dodge Caravan.

226. At approximately 4:09 p.m., the Dodge Caravan was pulled over by the Madison Police Department (MPD) for a violation of Wisconsin Traffic Law on Pennsylvania Ave at N. 6th St. in the City of Madison, WI. The driver of the silver Caravan was identified as Jeffrey A. Klahn, an Uber driver. The passenger of the vehicle was identified as Cierra S. MCGARY via Illinois driver license.

227. At approximately 4:16 p.m., a canine alerted to the odor of drugs within the vehicle as indicated by canine hander. Subsequently, MCGARY was asked to exit the vehicle, and she did so with the black backpack. MCGARY volunteered to MPD officers that she had marijuana in her possession and surrendered 4.1 grams of marijuana with packaging. MPD officers conducted a search of the Dodge Caravan with negative results for contraband. MPD officers spoke with Klahn and he stated he had received a request for a ride pick up at 750 Lake St., Madison, WI and the Uber order had the name "Nino" associated with it. Based on CHS and SOI reporting I know GARRETT uses the alias Nino on his Cash App accounts. Klahn showed Officer E. Erickson his phone and it showed the address of 3724 W Karstens Dr., Madison, WI when he was asked where his passenger was supposed to be dropped off at. I know 3724 W Karstens Dr to be associated with the CGCE.

228. A search of MCGARY's backpack by MPD officers, based on the canine alert, revealed an object that was approximately 1" by 5" by 9" and wrapped in a black rubber material further concealed by plastic bags, three sweatshirts, and a white garbage bag. Within the wrapping materials was a white, powdery substance further wrapped in multiple layers of plastic wrap.

229. MCGARY's cellular telephone, **TARGET DEVICE #10**, was seized and placed on airplane mode by MPD. During this time, MPD officers observed multiple missed calls and Facetime calls from telephone number 312-998-0597. A photograph of a text message, which was displayed on the home screen and did not require unlocking the device, received by MCGARY from telephone number 312-998-0597, which read, "1 minute dodge caravan" was taken by MPD. Investigators ceased receiving ping data for telephone number 708-362-1985 at approximately 5:13 p.m.

230. MCGARY was arrested by the Madison Police Department for State possession of controlled substance charges. SA Andrews utilized a NARK II Scott Reagent Modified test on the suspected cocaine seized from MCGARY, which indicated a presumptive positive result for the presence of cocaine. The weight of the suspected cocaine without the black rubber material was 1,039.7 grams. The custody of the cocaine and MCGARY's cellular telephone were maintained by the Dane County Narcotics Task Force.

231. On January 26, 2026, the Investigative Team attempted to interview MCGARY at the Dane County Jail. MCGARY did not make any statements to investigators.

232. Additionally on January 26, 2026, the Honorable Dane County Circuit Court Judge Diane Schlipper authorized a State of Wisconsin Pen Register Trap and Trace and a Ping GPS warrant for GARRETT's known telephone number 773-656-2458. Upon executing the

94

warrant, the service provider, T-Mobile, notified the Investigative Team that on January 18, 2026, the number 773-656-2458 changed to 312-998-0597 within the same account. Investigators believed GARRETT switched numbers and was utilizing the new number to communicate with MCGARY prior to the traffic stop by MPD.

233. **TARGET DEVICE #10** was transferred to FBI custody on February 6, 2026, from the Madison Police Department and is currently stored at the FBI Milwaukee Office. This device is likely to contain evidence of MCGARY's participation in the overall conspiracy. As described herein, investigators believe that MCGARY participated in at least two identified trips from the Chicago area to Madison to re-supply the CGCE with controlled substances. Because members of the CGCE commonly communicated through cellular telephones, I believe that evidence will be found on **TARGET DEVICE #10** regarding both of these trips. Specifically, there will likely be evidence about where MCGARY picked up the controlled substances before travelling to Madison. This would identify additional co-conspirators and potential additional stash houses in the Chicagoland area. Additionally, I believe there may also be evidence of additional historical resupply trips MCGARY completed for the CGCE.

### *Searches of the KARSTEN RESIDENCES and 756 Odana Ln*

234. On January 23, 2026, the Honorable U.S. Magistrate Judge Anita M. Boor authorized a federal search warrant for the properties of 3722 W Karstens Dr Apts #1, #2, #3, and #4, and 756 Odana Ln. Additionally, the search warrant authorized the search of the following persons: Christian GARRETT, Sharad WILLIAMS, Tevin NEWELL, Edward MCCLAIN, Jerden MONTGOMERY, Mark YOUNG, Ace DAVIS, Charles WRIGHT, and Adam KILIAN HOVEY.

235. On January 24, 2026, Dane County Circuit Court Judge, Diane Schlipper, authorized law enforcement to search 3724 W Karstens Dr Apt #2.

236. On January 26, 2026, Dane County Circuit Court Judge, Diane Schlipper, authorized law enforcement to search 3724 W Karstens Dr Apt #3.

237. On January 27, 2026, at approximately 6:00 AM the FBI, DEA, and DCNTF executed the search warrant with the assistance of FBI SWAT teams, the Madison Police Department SWAT Team, and officers and investigators from other federal and local law enforcement agencies.

238. FBI SWAT teams from the Milwaukee Division and Chicago Division assisted in clearing the apartments located at 3722 W Karstens Dr and 3724 W Karstens Dr for any persons prior to the search teams entering.

239. The Madison Police Department SWAT team cleared 756 Odana Ln for any persons prior to the search team entering.

240. The FBI lead the search teams at 3722 W Karstens Dr apartments #1, #2, #3, and #4. The DCNTF led the search teams at 3724 W Karstens Dr apartments #2 and #3. The DEA led the search team at 756 Odana Ln.

241. While executing the warrant at 3722 W Karstens Dr FBI SWAT team members encountered and detained the following subjects: GARRETT, WILLIAMS, MCCLAIN, MONTGOMERY, YOUNG, WRIGHT, and HOVEY. It should be noted that while FBI SWAT was initially clearing 3722 W Karstens Dr they used a "call out" tactic that involves setting an exterior perimeter around the building and using a loudspeaker to notify the residents to exit the apartment complex. Additionally, there are two ways to access the inside of 3722 W Karstens Dr. The first is the front door facing Karstens Dr

96

and the second is through a common basement door that connects with 3724 W Karstens Dr. SWAT personnel cleared and held the basement area and common area of 3722 W Karstens prior to the call out beginning and no subjects were encountered during this time. Due to these tactics the subjects who were encountered are known to have exited one of the 3722 W Karstens Dr apartments, 1, 2, 3, or 4, when the call out began and were then detained by SWAT personnel on scene.

242. While executing the warrant at 756 Odana Ln Madison Police Department SWAT team members encountered and detained DAVIS.

243. While searching 3722 W Karstens Dr Apt #2, the search team located **TARGET DEVICE #1** on the floor of the living room. The Investigative Team called telephone number, (310) 290-2233, known to be associated with GARRETT based on CHS reporting, while **TARGET DEVICE #1** was on. TARGET DEVICE received an incoming call from the Investigative Team. Additionally, the search team located suspected narcotics, drug paraphernalia to include scales and cooking material used to make cocaine base, and lastly $2225 in US currency. The suspected narcotics include approximately 6.8 grams of packaged cocaine base which was later tested using the TruNarc Field Test Unit and tested positive for the presence of cocaine base. Based on the above **TARGET DEVICE** #1 is believed to be GARRETT's phone and had been in an apartment with drug distribution evidence. It was seized and is currently stored at the FBI Milwaukee Office.

244. WILLIAMS was searched at 3722 W Karstens Dr after he was located and detained at the same location by the FBI. The FBI turned WILLIAMS over to the Madison Police Department and he was detained in a marked squad car while the search warrant

execution was completed. SA Thurmer searched WILLIAMS with the assistance of the Madison Police Department at 7:35 am. **TARGET DEVICE # 2** was located on WILLIAMS person and seized. **TARGET DEVICE #2** is currently stored at the FBI Milwaukee Office.

245. While searching WILLIAMS, SA Thurmer asked if he had any other phones. WILLIAMS stated he had a phone inside 3722 W Karstens Dr Apt #1, more specifically in the left-hand bedroom as you walked in the front door. WILLIAMS described the phone as being a black iPhone. While searching apartment #1 the search team located a black iPhone, **TARGET DEVICE #3**, on the floor in the room described by WILLIAMS. Only one other phone was located in the room, a blue iPhone, **TARGET DEVICE #7**. Both **TARGET DEVICE #3** and **TARGET DEVICE #7** were located powered on. **TARGET DEVICE #3** is believed to be WILLIAMS's second phone and was seized. **TARGET DEVICE #3** is currently stored at the FBI Milwaukee Office.

246. MONTGOMERY was searched at the Madison Police Department North District after he was located and detained at 3722 W Karstens Dr by the FBI. The FBI turned MONTGOMERY over to the Madsion Police Department and he was transported from Karstens Dr to the Police Department where he was detained while the search warrant execution was completed. SA Thurmer searched MONTGOMERY with the assistance of the Madison Police Department at approximately 9:30 am. **TARGET DEVICE #4** and **TARGET DEVICE #5** were located on MONTGOMERY's person and seized. **TARGET DEVICE #4** and **TARGET DEVICE #5** are currently stored at the FBI Milwaukee Office.

247. YOUNG was searched at 3722 W Karstens Dr after he was located and detained at the same location by the FBI. The FBI turned YOUNG over to the Madison Police Department and he was detained in a marked squad car while the search warrant was completed. SA Thurmer searched YOUNG with the assistance of the Madison Police Department at approximately 8:05 am. **TARGET DEVICE #6** was located on YOUNG's person and seized. **TARGET DEVICE #6** is currently stored at the FBI Milwaukee Office.

248. As previously stated, **TARGET DEVICE #7** was located in 3722 W Karstens Dr Apt #1, powered on, in the same room as **TARGET DEVICE #3,** which is believed to be owned by WILLIAMS. Additionally, it matches the description provided by WILLIAMS on scene of his second phone. Also located in apartment #1 were suspected narcotics, drug paraphernalia to include packaging material and scales, and $3000 in US currency. The suspected narcotics included approximately 245 grams of packaged suspected cocaine base which was later field tested using the TruNarc Field Test Unit and tested presumptive positive for the presence of cocaine base. Additionally, approximately 37.2 grams of suspected heroin/fentanyl mixture was located which was later field tested using a Scott Reagent modified test kit and tested presumptive positive for heroin. Lastly, approximately 181.4 grams of packaged methamphetamine was located which was later field tested using the TruNarc Field Test Unit and tested presumptive positive for the presence of methamphetamine. **TARGET #7** was found in apartment #1 with other evidence related to drug distribution. Additionally, CHS and SOI reporting indicates apartment #1 was the primary "trap" for the CGCE. Investigators believe **TARGET #7**,

although having an unknown owner, will contain evidence of the TARGET OFFENSES. **TARGET DEVICE #7** is currently stored at the FBI Milwaukee Office.

249. While searching 3722 W Karstens Dr Apt #2, the search team located **TARGET DEVICE #8** on a mattress in one of the two bedrooms. The device was seized and later powered on by SA Thurmer. Upon the device turning on SA Thurmer noticed that the phone was locked and had a background photograph of Kristina SULLIVAN. Based on the DCNTF refuse search which found indicators of SULLIVAN receiving mail at apartment #2, SULLIVAN's known involvement as a potential human trafficking victim and associate of the CGCE, as well as **TARGET DEVICE #8** being found in apartment #2, a known CGCE controlled property, investigators believe the device will contain evidence of the TARGET OFFENSES. **TARGET DEVICE #8** was seized and is currently stored at the FBI Milwaukee Office.

250. While searching 756 Odana Ln, SA Callon Andrews interviewed DAVIS, who had been located at the residence. DAVIS described a phone, **TARGET DEVICE #9**, belonging to him inside 756 Odana Ln. DAVIS described the color and location. SA Andrews located the phone in an upstairs bedroom, the same location that was described by DAVIS. DAVIS stated the phone was his and confirmed the telephone number associated with it. DAVIS provided written consent to the Investigative Team to search the phone. Due to the damaged condition of the phone, specifically a cracked and damaged front screen, upon its seizure, the Investigative Team will have to extract the contents in order to search the phone properly. DAVIS reported that while the phone belongs to him, his female associates sometimes stole the phone and used it without DAVIS's permission. DAVIS reported the phone did not have a security code to unlock the device. Although

100

DAVIS provided consent to search the phone, investigators seek authorization to search the phone in an abundance of caution. **TARGET DEVICE #9** is stored at the FBI Milwaukee Office.

251. While searching 3722 W Karstens Dr Apt #3, the search team located **TARGET DEVICE #11** in a bedroom closet. The device was seized and later powered on by SA Thurmer. Upon the device turning on SA Thurmer noticed that the phone was locked and had a background photograph of Christian GARRETT holding multiple stacks of what is believed to be US currency. Additionally, there are what is believed to be stacks of US currency near his feet. Based on SOI and CHS reporting as well as TIII intercepts the investigative team knows that GARRETT uses multiple phones. Additionally, based on the same sources, GARRETT is known to use multiple apartments within 3722 W Karstens Dr. During the initial execution of the search warrant at 3722 W Karstens Dr, GARRETT is believed to have exited either apartment #3 or #4 when FBI SWAT encountered him and detained him. Both lower units, #1 and #2 had been cleared by FBI before encountering GARRETT. Based on these facts' investigators believe **TARGET DEVICE #11** is owned by GARRETT and the device will contain evidence of the TARGET OFFENSES. **TARGET DEVICE #11** was seized and is currently stored at the FBI Milwaukee Office.

## BACKGROUND ON SEX TRAFFICKING

252. This investigation concerns alleged violations of Title 18, United States Code, Section 1591, relating to sex trafficking by force, fraud, or coercion. Section 1591(a)(1) prohibits a person from knowingly, in or affecting interstate or foreign commerce, recruiting, enticing, harboring, transporting, providing, obtaining, or maintaining a person, knowing,

or in reckless disregard of the fact that means of force, fraud, or coercion will be used to cause the person to engage in a commercial sex act. Title 18, United States Code, Section 1591(a)(2) further prohibits a person from benefitting financially, or by receiving anything of value, for participation in a venture as described in Section 1591(a)(1).

253. Under Section 1591(e)(2), "coercion" is defined to include: (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or legal process.

254. "Serious harm," as used in the first two prohibited forms of coercion under Section 1591(a)(1), is defined under Section 1591(e)(5) as: any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

255. Under Section 1591(e)(3), "commercial sex act" means any sex act for which anything of value is given to or received by any person.

256. I know from training and experience, and in consultation with other law enforcement officials involved in trafficking investigations, that to hold victims in fear of serious financial harm, traffickers often lure victims on false promises of good earnings, then manipulate debts, impose inflated charges, control all earnings, and withhold promised pay, leaving victims completely dependent on the trafficker for shelter and sustenance, fearing homelessness, destitution, and insurmountable debts if they attempt to leave.

Traffickers often isolate their victims from friends, family, and any other means of support.

257. I also know, from training and experience, and in consultation with other law enforcement officials involved in trafficking investigations, that victims are often recruited from troubled backgrounds or desperate circumstances, leaving them with limited alternatives, and traffickers are skilled at preying on psychologically vulnerable victims who typically have a history of trauma and abuse. Traffickers and their associates deliberately target victims who, without stable, supportive homes, are drawn to false promises of love and acceptance into a surrogate "family." Victims form strong psychological bonds with their traffickers that persist even when traffickers brutally abuse them. Many victims insist that they remained with the trafficker at least partially out of love or loyalty rather than fear, which can significantly complicate the ability to prove beyond a reasonable doubt that the prohibited means of coercion caused the victim's continued participation in commercial sex acts.

258. Based on the information described above, I believe there is probable cause that GARRETT, WILLIAMS, MONTGOMERY, YOUNG, MCGARY, SULLIVAN, and DAVIS have committed the TARGET OFFENSES, and that evidence of these crimes, including evidence of a larger conspiracy and its accomplices, can be found on the **TARGET DEVICES**.

259. The **TARGET DEVICES** are currently in secure evidence storage at the FBI Milwaukee Field Office, in St. Francis, Wisconsin. In my training and experience, I know that the **TARGET DEVICES** have been stored in a manner in which their contents are, to the

extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICES** first came into the possession of law enforcement.

260. I am requesting to search the **TARGET DEVICES** for records back to January 1, 2025, because that will provide sufficiently recent records to reveal evidence of the suppliers and customers of the controlled substances involved in this case, as well as identify potential co-conspirators and witnesses. This will also reveal additional communications between the co-conspirators that predated the interception orders but still occurred during the timespan of the conspiracy. I am also aware this timeframe will cover the period beginning just prior to law enforcement beginning controlled buys from GARRETT where based on information from confidential sources described above, GARRETT and other coconspirators engaged in both drug trafficking and sex trafficking. This timeframe will assist investigators in understanding the scope of the conspiracy as it existed when the investigation initially began. Based upon my education, training, and experience, I know that persons who engage in the manufacture, sale, or distribution of controlled substances, frequently employ cellular telephones to conduct their narcotics trafficking. These individuals use their cellular telephones to maintain contact lists, arrange the purchase and delivery of controlled substances, store pictures of drugs or guns, and generally communicate with drug associates about controlled substances. These individuals often use multiple cellular telephones to conduct their business. These individuals often use their cellular telephones to leave voice mail messages, retrieve voice mail messages, and send what are commonly referred to as "text messages" or "instant messages". These individuals also use various applications ("apps") to communicate with one another about their narcotics trafficking. Oftentimes, these apps

offer encrypted end-to-end communication that makes it difficult for law enforcement investigators to capture or obtain pertinent data with traditional legal process, absent the physical cell phone. Further, individuals involved in drug and sex trafficking commonly use applications on cellular telephones to conduct financial transactions using funds derived from their illegal activities for the purpose of concealing the funds origin and/or to procure additional products to facilitate the illegal activities.

260. Through my training, experience, and in consultation with other law enforcement officials, I have learned that individuals involved in sex trafficking:

a. Commonly use cellular telephones, desktop and laptop computers, and/or other similar electronic devices to coordinate their illicit activities. In part, these individuals are known to use these types of devices to access social media platforms and financial accounts to further their criminal activities and maintain these devices on their persons and/or in their residences.

b. Maintain records, including electronic files, often in their residences, related to their illicit business on computers and servers hosting internet applications, including but not limited to social media applications.

c. Often solicit clients through electronic advertisements and other media.

d. Commonly earn income in the form of cash and try to legitimize these profits. In order to do this, subjects frequently attempt to transfer and conceal the money by means such as placing assets in names other than their own to avoid detection while maintaining control or using the money to buy assets which are sometimes difficult to trace.

261. The **TARGET DEVICES** seized by investigators are wireless telephones. Based on my training and experience, I believe the devices to be equipped with digital cameras, portable media players, and GPS. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may include geolocation information indicating where the cell phone was at particular times. Cell phones typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player") is a handheld storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of satellites orbiting the Earth. Each Satellite contains an extremely

107

accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

262. Based on my training, experience, and research, and from consulting the manufacturer's advertisements, I believe the **TARGET DEVICES** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device. In my training and experience, examining data stored on a device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

263. Based on my knowledge, training, and experience, I know that electronic devices like the **TARGET DEVICES** can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on devices like the **TARGET DEVICES**. This information can sometimes be recovered with forensic tools.

264. As explained below, information stored within wireless telephones or cellular phones (cell phones) may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further

suspicion. In my training and experience, the information stored within a cell phone can indicated who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

265. Forensic evidence: As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the computer and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

266. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

267. Manner of execution. Because this warrant seeks only permission to examine device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

<strong>CONCLUSION</strong>

268. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices, described in Attachment A, to seek the items described in Attachment B.

111

# ATTACHMENT A

The property to be searched, collectively the TARGET DEVICES, is described as follows:

## Target Device 1

An Apple iPhone, unknown model, unknown serial number, with a blue backing and single camera lens, believed to be owned by Christian GARRETT and seized from inside 3722 W Karstens Dr #2, Madison, WI on January 27, 2026. **TARGET DEVICE 1** is labeled as evidence item 1B24 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

## Target Device 2

An Apple iPhone, unknown model, unknown serial number, with a black backing three camera lenses, and a black protective case, believed to be owned by Sharad WILLIAMS and seized from his person on January 27, 2026. **TARGET DEVICE 2** is labeled as evidence item 1B14 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

## Target Device 3

An Apple iPhone, unknown model, unknown serial number, with a black backing and two camera lenses, believed to be owned by Sharad WILLIAMS and seized from 3722 W Karstens Dr #1, Madison, WI on January 27, 2026. **TARGET DEVICE 3** is labeled as evidence item 1B8 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

112

**Target Device 4**

A Samsung phone, unknown model, IMEI number 351867553456127 printed on the back, with a dark blue backing and three camera lenses, believed to be owned by Jerden MONTGOMERY and seized from his person on January 27, 2026. **TARGET DEVICE 4** is labeled as evidence item 1B20 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

**Target Device 5**

A Foxx Android phone, unknown model, unknown serial number, with a black backing and three camera lenses, believed to be owned by Jerden MONTGOMERY and seized from his person on January 27, 2026. **TARGET DEVICE 5** is labeled as evidence item 1B19 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

**Target Device 6**

A Foxx Android phone, unknown model, unknown serial number, with a black backing and two camera lenses, believed to be owned by Mark YOUNG and seized from his person on January 27, 2026. **TARGET DEVICE 6** is labeled as evidence item 1B15 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

**Target Device 7**

An Apple iPhone, unknown model, unknown serial number, with a cracked and broken blue backing and two camera lenses, with an unknown owner and seized from inside 3722 W Karstens Dr #1, Madison, WI on January 27, 2026. **TARGET DEVICE 7** is labeled as evidence

item 1B7 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

### Target Device 8

An Apple iPhone, unknown model, unknown serial number, with a black backing, a single camera lens, and a green protective case with a bear logo, believed to be owned by Kristina SULLIVAN and seized from inside 3722 W Karstens Dr #2, Madison, WI on January 27, 2026. **TARGET DEVICE 8** is labeled as evidence item 1B26 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

### Target Device 9

A Summit 5G phone, unknown model, unknown serial number, with a blue backing and four camera lenses, believed to be owned by Ace DAVIS and seized from inside 756 Odana Ln, Madison, WI on January 27, 2026. **TARGET DEVICE 9** is labeled as evidence item 1B17 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

### Target Device 10

An Apple iPhone, unknown model, unknown serial number, further described in Attachment A, believed to be owned by Cierra MCGARY and seized from her person during an arrest in Madison, WI on January 24, 2026. **TARGET DEVICE 10** is labeled as evidence item 1B45 and is in the custody of the FBI and is physically located at the FBI Milwaukee Field Office.

**Target Device 11**

An Apple iPhone, unknown model, unknown serial number, with a blue backing, three camera lenses, and a blue protective cas, believed to be owned by Christian GARRETT and seized from inside 3722 W Karstens Dr #3, Madison, WI on January 27, 2026. **TARGET DEVICE 11** is labeled as evidence item 1B42 and is in the custody of the FBI and physically located at the FBI Milwaukee Field Office.

This warrant authorizes the forensic examination of the devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.  All records on the **TARGET DEVICES** described in Attachment A, along with any memory card or other data storage device within or connected to that device, from January 1, 2025, to present, that relate to violations of distribution, possession, and possession with intent to distribute controlled substances, in violation of Title 21 U.S.C. § 841; conspiracy to distribute, possess, and possession with intent to distribute controlled substances, in violation of Title 21 U.S.C. § 846; money laundering in violation of Title 18 U.S.C. § 1956; and sex trafficking by force, fraud, or coercion, in violation of Title 18 U.S.C. § 1591(a)(1), including:

    a.  All outgoing and incoming calls, electronic mail, text messages, and instant messages, including chats or messages from social media platforms;

    b.  Lists of suppliers and customers, drug records or ledgers, and related identifying information;

    c.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    d.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    e.  All bank records, checks, credit cards bills, account information, and other financial records;

    f.  Evidence indicating the geographic location of the cell phone at times relevant to the investigation;

    g.  Records of Internet Protocol addresses used;

116

h. Evidence indicating the cell phone user's state of mind as it relates to the crime under investigation; and

i. Pictures or videos of drugs or drug associates.

j. Any information, to include photographs, videos, messages, call records, financial transactions, social media posts, notes, documents, price lists, menus, online advertisement, and emails relating to commercial sex.

2. Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history.

3. Records and information stored within the **TARGET DEVICES**, along with any memory card or other data storage device within or connected to that cellular telephone, which is in secure storage at the FBI Milwuakee Office Evidence Control Center storage in St. Francis, Wisconsin , such as:

a. Drug records, address books, calendars and scheduling data, drug notes, drug ledgers, seller lists, buyer lists;

b. Data indicating outgoing and incoming calls to drug sellers and buyers together with emails, chat, text, or instant messages;

c. Sex trafficking records, address books, calendars and scheduling data, commercial sex notes, ledgers, customer lists.

d. Data indicating outgoing and incoming calls to commercial sex customers with emails, chat, text, or instant messages;

117

e.  Evidence indicating how and when the cell phone account was accessed or used, to determine the chronological context of account access, use, and events relating to the crime under investigation and to the cell phone account owner;

f.  Evidence indicating the geographic location of the cell phone at times relevant to the investigation; and,

g.  Evidence indicating the cell phone account owner's state of mind as it relates to the crime under investigation.

4.  As used above, the terms "records" and information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

118